Jeff Rose, Chief Justice *694 The State of Texas filed this appeal contending that the district court abused its discretion by setting aside the indictment against Dennis Davis for violation of his Sixth Amendment right to a speedy trial. The State contends that the court's order dismissing the indictment was not justified by a properly conducted analysis under Barker v. Wingo , 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We will reverse the district court's order.
BACKGROUND
Our speedy-trial analysis occurs in the context of a long procedural history encompassing Davis's indictment, jury trial resulting in a judgment of his guilt, reversal by the court of appeals, review by the Court of Criminal Appeals, remand to the district court, and his indictment being set aside. The facts of the underlying case are set forth in this Court's 2013 opinion:
Natalie Antonetti was assaulted in her Austin apartment in the early morning hours of Sunday, October 13, 1985. There was no sign of forced entry, and nothing was stolen. Antonetti was not sexually assaulted and had no defensive wounds. The blunt force trauma to her head, which the medical examiner found consistent with having been attacked with a club or small bat, caused skull fractures, brain contusions, and a coma from which Antonetti never recovered. Antonetti died after the withdrawal of life support. The crime remained unsolved after the death of Austin Police Department Sergeant Edward Balagia, a homicide detective who served as lead investigator and conducted most of the interviews and evidence collection.
The unsolved "cold case" was reopened in 2007 after a call to a homicide tip line from Rebecca Davis, the wife of appellant Dennis Davis. Rebecca told police that in 1991 after a few drinks, Davis cried and said he had "sinned against God and man," which she suspected was a reference to the unsolved murder of Davis's former girlfriend, Antonetti.
Davis was charged with Antonetti's murder. Davis's wife Rebecca recanted her story and argued unsuccessfully that Davis's statement to her was shielded by marital privilege. At trial, there was no physical or forensic proof connecting Davis to the crime; rather, his prosecution hinged on circumstantial evidence and testimony from witnesses, many of whom had not been contacted during the investigation back in the 1980s. The circumstantial evidence about Davis included Davis's relationship and last interaction with Antonetti, his arrival at the scene after the assault, his statements after the assault, his alibi, his ownership of a car similar to one seen in the parking lot of the apartments on the morning of the assault, and other acts of aggression in the years since Antonetti's assault. The jury also considered certain statements and a 911 call from Donn Chelli, Antonetti's neighbor at the time of the assault.
Davis v. State , 413 S.W.3d 816, 820 (Tex. App.-Austin 2013, pet. ref'd). The jury convicted Davis in 2011 for Antonetti's *695 murder, and the court sentenced him to thirty-six years' imprisonment. Id. at 819. The jury was not presented with evidence of a potential third-party perpetrator, including evidence of Antonetti's neighbor's identification of a different man from a photographic lineup as the person that he had seen holding a club or small bat while looking into the neighbor's apartment on the morning of Antonetti's assault. See ids="7091794" index="5" url="https://cite.case.law/sw3d/413/816/#p820">id. at 827. This Court determined that Davis received ineffective assistance of counsel, reversed his conviction, and remanded this cause for a new trial. Id. at 838. The Texas Court of Criminal Appeals refused the State's petition for discretionary review. See In re Davis , No. PD-1520-13, 2014 Tex. Crim. App. LEXIS 183, at *1 (Tex. Crim. App. Feb. 5, 2014). This Court issued our mandate in Davis's appeal on March 6, 2014.
On March 28, 2014, after remand, the district court appointed new counsel for Davis. Defense counsel filed a "Motion for Expedited DNA Analysis" on July 15, 2014, and the district court signed an order granting that motion the next day. Davis filed a "Motion to Dismiss for Want of a Speedy Trial" on October 1, 2014, which the district court denied at a hearing on October 13, 2014. Davis then filed a "Motion to Set Aside Indictment for Failure to Afford Constitutional Right to Speedy Trial" on November 19, 2014. The district court considered the motion to set aside the indictment at a hearing held November 25, 2014, and kept the motion under advisement.
At a status-review hearing on December 1, 2014, the State advised the district court of its intent to file a motion for continuance of the trial scheduled for December 8, 2014, seeking the completion of DNA testing. The district court stated that it was inclined to grant the State's continuance because the parties were "all better served by having the DNA results." Davis agreed "that [wa]s the best course of action," and defense counsel added that Davis was not waiving his speedy-trial right. But Davis reemphasized the importance of the DNA testing and his willingness to wait for the completion of such testing. The district court then stated its intent to reschedule the trial for May 4, 2015.
When the State filed its motion for continuance on December 4, 2014, it also filed a motion to dismiss the criminal action against Davis "pending further investigation." That same day, the district court held a docket call and pretrial hearing, after which it denied the State's motion to dismiss the criminal action against Davis, signed an order granting the State's motion for continuance and resetting the trial for May 4, 2015, and kept under advisement Davis's motion to set aside the indictment.
Between January and May of 2015, the district court signed several orders concerning the items to be subjected to DNA testing, comparison samples or profiles of certain suspects to be used in the testing, and payment arrangements for the testing. Cellmark Forensics provided the final results of its DNA testing on May 12, 2015. On July 14, 2015, Davis filed an amended "Motion to Set Aside Indictment for Failure to Afford Constitutional Right to Speedy Trial," and the State filed a response on August 4, 2015. The district court did not hold a hearing on Davis's motion. On September 9, 2015, the district court signed an "Order Setting Aside Indictment for Failure to Afford Constitutional Right to Speedy Trial," issuing findings of fact and conclusions of law in support of its ruling. The State then filed this appeal from the order setting aside Davis's indictment.
*696 DISCUSSION
The State contends that the district court abused its discretion by granting Davis's motion to dismiss the indictment for violation of his right to a speedy trial. See U.S. Const. amend. VI. The State raises four issues in this appeal that it has briefed together, collectively contending that the court erred in its application of the factors considered in determining the speedy-trial issue under the United States Supreme Court's Barker case. Consideration of the speedy-trial issue in this appeal requires close review of the events in this case. See Emery v. State , 881 S.W.2d 702, 707 (Tex. Crim. App. 1994) (setting forth procedural history in some detail to resolve speedy-trial issue). The following is a chronology of significant events in this case:
10/13/85 assault leading to death of Natalie Antonetti
07/07/06 case reopened with "outcry" call to homicide tip line from Davis's estranged wife
06/30/09 indictment returned charging Davis with Antonetti's murder
07/02/09 Davis arrested
07/28/10 Davis released following bail reduction from $1,000,000 to $750,000
04/11/11 jury trial begins
04/15/11 jury renders verdict of guilty
04/18/11 district court signs judgment of conviction and sentences Davis to 36 years in prison
Davis is remanded to custody
07/08/11 Davis files notice of appeal
02/01/13 witness Donn Chelli, neighbor of the victim, dies
08/30/13 Third Court of Appeals reverses Davis's conviction and remands case for new trial
10/07/13 Third Court of Appeals overrules State's motion for rehearing
02/05/14 Texas Court of Criminal Appeals refuses State's petition for discretionary review
03/06/14 Third Court of Appeals issues its mandate
03/28/14 district court appoints new trial counsel for Davis after remand
04/24/14 Davis released on bond
07/15/14 Davis's new counsel moves for expedited DNA analysis
07/16/14 district court signs order for expedited DNA analysis
10/01/14 Davis files motion to dismiss for speedy-trial violation
10/13/14 district court denies Davis's motion to dismiss at hearing
11/19/14 Davis files motion to set aside indictment for speedy-trial violation
11/25/14 district court holds pretrial hearing
State presents motion to dismiss "pending further investigation"
district court takes the State's motion under advisement
Davis argues his motion to set aside indictment for speedy-trial violation
district court takes Davis's motion under advisement
12/01/14 district court holds status-review hearing
State advises of intent to seek continuance for completion of DNA testing
district court states its intent to grant continuance and reset trial
12/04/14 district court holds pretrial hearing
State files motion to dismiss "pending further investigation," which district court denies
State files motion for continuance, which district court grants
Davis reasserts his motion to set aside indictment for speedy-trial violation *697 district court takes Davis's motion under advisement
07/14/15 Davis files amended motion to set aside indictment for speedy-trial violation
09/09/15 district court signs order setting aside Davis's indictment for speedy-trial violation
Standard of review and Barker test
The constitutional right to speedy trial protects defendants from oppressive pretrial incarceration, mitigates the defendant's anxiety and concern from public accusations, and ensures that the defendant can mount a defense. See U.S. Const. amend. VI ; Henson v. State , 407 S.W.3d 764, 766 (Tex. Crim. App. 2013) ; see also U.S. Const. amend. XIV ; Leachman v. Stephens , 581 Fed.Appx. 390, 402 (5th Cir. 2014) (noting that Sixth Amendment right to speedy trial applies to states by incorporation under Due Process Clause of Fourteenth Amendment). The right to a speedy trial attaches when a person "becomes an accused," i.e., when he is arrested or when he is charged. Henson , 407 S.W.3d at 767.
There is no set amount of delay that is too much. Id. Rather, "[t]he speedy-trial right is 'amorphous,' 'slippery,' and 'necessarily relative.' " Hopper v. State , 520 S.W.3d 915, 923-24 (Tex. Crim. App. 2017) (quoting Vermont v. Brillon , 556 U.S. 81, 89, 129 S.Ct. 1283, 173 L.Ed.2d 231 (2009) ). Speedy-trial claims are analyzed on an ad hoc basis, applying the fact-specific balancing test set forth in Barker , under which the conduct of the prosecution and the defendant are weighed based on four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) any prejudice inflicted by the delay. Id. ; Henson , 407 S.W.3d at 767. Texas courts apply the same Barker test for speedy-trial analysis under state law as under federal law. Harris v. State , 827 S.W.2d 949, 956 (Tex. Crim. App. 1992).
If the delay is unreasonable enough to be presumptively prejudicial, the first Barker factor is satisfied and consideration of the remaining three factors is triggered. Cantu v. State , 253 S.W.3d 273, 281 (Tex. Crim. App. 2008). The length of delay that will provoke a speedy-trial inquiry is "necessarily dependent upon the peculiar circumstances of the case." Zamorano v. State , 84 S.W.3d 643, 648-49 (Tex. Crim. App. 2002). The nature of the charged offense is considered-for instance, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." Id. at 649. Further, the presumption that pretrial delay has prejudiced a defendant intensifies over time. Id. Thus, any speedy-trial analysis depends first on whether the delay is more than "ordinary," and the longer the delay, the more prejudicial that delay is to the defendant. Id. Generally, delays "approaching one year" will trigger a speedy-trial inquiry. Balderas v. State , 517 S.W.3d 756, 768 (Tex. Crim. App. 2016) ; Shaw v. State , 117 S.W.3d 883, 889 (Tex. Crim. App. 2003) ; Dragoo v. State , 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (quoting Doggett v. United States , 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (noting that "[d]epending on the nature of the charges," lower courts have generally found postaccusation delays approaching one year "presumptively prejudicial")).
Under the Barker test, the State bears the burden of justifying the length of the delay, while appellant must meet his burden of proving his assertion of the right to speedy trial and showing prejudice. Cantu , 253 S.W.3d at 280. We review factual components of the court's ruling *698 on a speedy-trial claim for an abuse of discretion and review legal determinations de novo, but the balancing test as a whole presents a purely legal question. Id. at 282. We consider evidence presented at the speedy-trial hearing in the light most favorable to the court's ultimate ruling. Id.
Length of delay
In its findings and conclusions, the district court determined that "the length of the delay in this case is unreasonable and presumptively prejudicial." The parties dispute how such delay should be calculated, i.e., which events start the clock on the speedy-trial calculation, and the district court did not decide the precise length of the delay. We must determine the length of the delay and whether it was presumptively prejudicial before we decide whether further analysis is necessary under the remaining Barker factors. See State v. Munoz , 991 S.W.2d 818, 821 (Tex. Crim. App. 1999) (citing Barker , 407 U.S. at 530, 92 S.Ct. 2182 ).
In determining the length of the delay, we note the events setting the outer bounds-that Davis was indicted on June 30, 2009, and that the district court, post-appeal, signed its order setting aside the indictment on September 9, 2015. See Henson , 407 S.W.3d at 767 (concluding that right to speedy trial attaches when person "becomes an accused"); Emery , 881 S.W.2d at 708 (calculating length of delay to include entire time span from defendant's indictment, through initial trial, reversal on appeal, and his second trial); see also George E. Dix & John M. Schmolesky, 42 Texas Practice: Criminal Practice and Procedure § 28:10, at 668 (3d ed. 2011) (citing Emery and stating "clearly delay caused by appeal and reversal for new trial must be considered in calculating whether the delay before the subsequent trial violates the Sixth Amendment right").[1] The overall time between the June 30, 2009 indictment and the September 9, 2015 order setting aside the indictment, including the appellate process, is more than six years, a time period sufficient to trigger analysis of the remaining Barker factors. See Balderas , 517 S.W.3d at 768 ; Cantu , 253 S.W.3d at 281.
As part of the first Barker length-of-delay factor, we must also consider the extent to which the length of delay exceeded the minimum necessary to trigger judicial examination. See Balderas , 517 S.W.3d at 768 ; Zamorano , 84 S.W.3d at 649 ("If the interval between accusation and trial has crossed the threshold dividing 'ordinary' from 'presumptively prejudicial' delay, a court must then consider the extent to which that delay stretches beyond the bare minimum needed to trigger judicial examination of the claim."). Because the length of the delay here stretched beyond the bare minimum-i.e., a delay approaching one year in a more typical case not *699 involving an appeal-needed to trigger judicial examination of Davis's claim, we conclude that this factor, if considered alone, weighs in favor of a violation of Davis's right to a speedy trial. See Balderas , 517 S.W.3d at 768 (noting that interval of three and one-half years "stretched far beyond the minimum needed to trigger the enquiry" and weighed heavily in favor of finding violation of speedy-trial right). The threshold inquiry satisfied, we proceed to consider the remaining Barker factors. See Zamorano , 84 S.W.3d at 649.
Reason for delay
In assessing the reason for the delay under the second Barker factor, we are instructed to assign different weights to different reasons. See Balderas , 517 S.W.3d at 768 (citing Dragoo , 96 S.W.3d at 314 ). Valid reasons will justify appropriate delays. Id. Deliberate delay intended to " 'hamper the defense' " will weigh heavily against the State, but more neutral reasons, such as negligence or overcrowded courts, will weigh less heavily. Id. (quoting Brillon , 556 U.S. at 90, 129 S.Ct. 1283 ). We further consider " 'whether the government or the criminal defendant is more to blame for th[e] delay.' " Id. (quoting Doggett , 505 U.S. at 651, 112 S.Ct. 2686 ). Delay caused by the defendant or his counsel weighs against the defendant. Id. Delay caused by law enforcement or the prosecution weighs against the State. See Moore v. State , No. PD-1634-14, 532 S.W.3d 400, 402-05, 2017 WL 510567, at *2-3, 2017 Tex. Crim. App. LEXIS 167, at *7-8 (Tex. Crim. App. Feb. 8, 2017) (citing Barker , 407 U.S. at 534-35, 92 S.Ct. 2182 ). Between diligent prosecution and bad-faith delay is the middle ground of official negligence in bringing an accused to trial. Doggett , 505 U.S. at 656-57, 112 S.Ct. 2686. Such negligence is weighed more lightly than a deliberate intent to harm the accused's defense. Id. at 657, 112 S.Ct. 2686. Courts' tolerance of such negligence "varies inversely with its protractedness and its consequent threat to the fairness of the accused's trial." Id. (internal citation omitted).
Here, given the convoluted procedural history of the case, we will consider the delay in three phases: the time from Davis's indictment to his first trial, the time from Davis's conviction to the issuance of this Court's mandate, and the time from the issuance of this Court's mandate to the district court's signing of the order setting aside the indictment. The district court found that the primary cause of the "post-reversal delay" was the lack of DNA testing. The district court concluded that not conducting the DNA testing promptly after the reversal of Davis's conviction was unreasonable and a substantial cause of the delay, which the court found to weigh against the State. The State contends that the court erred by attributing pretrial delay due to DNA testing to the State.
1. Time from indictment to first trial
Davis's indictment on June 30, 2009, led to a trial that began on April 11, 2011, resulting in his conviction. The time between June 30, 2009, and April 11, 2011, is almost two years, which could be considered presumptively prejudicial depending on factual circumstances. However during this time, Davis did not assert his right to speedy trial and did not assert prejudice from that delay. When the trial occurred, Davis was afforded his speedy-trial right. See 42 Texas Practice: Criminal Practice and Procedure § 28:55, at 739 (noting that "once trial has been held, the [speedy-trial] right has been afforded the accused"). Thus, the period from Davis's June 30, 2009 indictment to the April 11, 2009 start of his first trial does not weigh against the State.
2. Time from conviction at trial to issuance of appellate mandate *700 We next consider whether the time span between Davis's judgment of conviction on April 18, 2011, and the issuance of the court of appeals' mandate on March 6, 2014-the earliest date that he could have been retried-violated his speedy-trial right as to his second trial. See id. § 28:57, at 741 (noting that "[i]f a defendant is retried after reversal of a conviction on appeal, the delay in the second trial occasioned by appellate review of the first conviction is of course relevant to whether delay in the second trial violated speedy trial rights"). During this time span, Davis successfully appealed his conviction to the court of appeals, then after the conviction was reversed on August 30, 2013, the State sought discretionary review from the Court of Criminal Appeals, which refused the State's petition on February 5, 2014. See In re Davis , 2014 Tex. Crim. App. LEXIS 183, at *1; Davis , 413 S.W.3d at 838. The time spent on appeal, between April 18, 2011, and March 6, 2014, was in large part attributable to Davis's pursuit of his appeal and weighs against him. See Balderas , 517 S.W.3d at 768 (noting that delay caused by defendant or his counsel weighs against defendant); see also Brillon , 556 U.S. at 90, 129 S.Ct. 1283 (noting that defendant whose trial was delayed by interlocutory appeal " 'normally should not be able ... to reap the reward of dismissal for failure to receive a speedy trial' ") (quoting United States v. Loud Hawk , 474 U.S. 302, 316, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) ); Gonzales v. State , No. 05-05-01140-CR, 2006 WL 1900888, at *6, 2006 Tex. App. LEXIS 5984, at *17 (Tex. App.-Dallas July 12, 2006, no pet.) (mem. op., not designated for publication) (noting that majority of delay was caused by defendant's appeal of his extradition and such delay did not weigh against State).
By contrast, appeal by the State "ordinarily is a valid reason that justifies delay" and does not weigh against the State if the basis of the appeal is reasonable. Loud Hawk , 474 U.S. at 315, 106 S.Ct. 648 ; see Davis , 413 S.W.3d at 828-38 (providing extensive analysis of ineffective-assistance issue that was basis for reversal and subject of State's petition for discretionary review). Here, the five or six months during which the State sought review from the Court of Criminal Appeals would be considered a justifiable delay. On the whole, these time intervals do not weigh in favor of a speedy-trial violation. See 42 Texas Practice: Criminal Practice and Procedure § 28:10, at 668 (noting that not all time included in length of delay weighs in favor of finding speedy-trial violation and that weight, if any, to be given to particular time period is to be determined with reference to considerations in Barker test).
Davis would have had no reason to assert a speedy-trial right while the judgment of conviction from his first trial was being reviewed on appeal, and he was not prejudiced by the appeal but ultimately benefitted from it by securing reversal of his conviction and remand of the cause for a new trial. Because Davis's appeal accounted for the greatest portion of time between his conviction and the issuance of the appellate mandate, and because the time spent on the State's appeal was justifiable, this time period does not favor a violation of Davis's right to speedy trial.
3. Time from issuance of appellate mandate to order setting aside indictment
Our focus turns to the eighteen-month span from the issuance of mandate on March 6, 2014, until the order setting aside Davis's indictment on September 9, 2015. See Hartfield v. Thaler , 403 S.W.3d 234, 239 (Tex. Crim. App. 2013) (concluding that defendant's conviction and sentence were vacated and order for new trial *701 became final when mandate issued). In its findings and conclusions, the district court found that "[t]he delay in this case resulted from multiple factors including the need for newly appointed counsel [appointed March 28, 2014] to get up to speed on the case and the court's crowded docket." We conclude that the record supports those findings and that those two factors, on this record, do not weigh heavily against the State in considering the reason for the delay. See Balderas , 517 S.W.3d at 768.
The district court found that the "primary cause" of the delay was the lack of DNA testing that the State had not promptly obtained:
[T]he primary cause of the post-reversal delay was the fact that DNA testing had not been done. The Michael Morton case was widely publicized in 2011 and the State was aware, at least as early as August, 2013 that there was biological material in this case which had never been tested. Expedited DNA testing was ordered by the court in July, 2014 but had not been accomplished as of the trial date in December, 2014. The defense asserts that the delay in DNA testing was a delay tactic on the part of the State. The record does not indicate a deliberate attempt to delay the trial but does suggest an initial lack of urgency coupled with problems in obtaining prompt action by the testing labs as demonstrated by the various email exchanges attached to Davis'[s] speedy trial motion and the uncontroverted chronology incorporated in the motion which the court hereby adopts. There is no indication that the defense contributed to the delay but in fact diligently sought to expedite the testing.
...
Conclusions of law regarding cause of the delay: The fact that this cold-case murder went to trial in 2011 without DNA testing during a massive public uproar over lack of DNA testing in the Michael Morton case is remarkable. That DNA testing in this case was not accomplished promptly after the reversal is unreasonable and was a substantial cause of the delay in question. This factor weighs against the State.
The record shows that the DNA testing was in advancement of Davis's defense and in fact was initiated at Davis's request on July 15, 2014, in his "Motion for Expedited DNA Analysis" not by the State. Davis's motion stated that his "counsel has determined that it is necessary to anal[y]ze certain items of clothing, shoes, and couch covers for the presence of DNA." While there was some delay in the State's arranging for the evidence to be transferred and in the State's obtaining approval of the order for evidence to be released and sent to the independent lab for testing, that accounted for just under three months of the eighteen-month period considered here. The record reflects that the district court signed an order on July 16, 2014, granting the expedited DNA testing that Davis requested and that the lab received the required documents and evidence on October 14, 2014.
At the December 4, 2015 docket call and pretrial hearing, the district court denied the State's motion to dismiss Davis's case pending further investigation, clarified the expanded scope of the DNA testing ordered, and granted the State's continuance, resetting the trial for May 4, 2015. Also during this hearing, the defense emphasized that the State had not initiated the DNA testing that was the basis for its motion for continuance and contended that the State "resisted" such testing, but the district court rejected that contention:
[Defense counsel]: I know we've had numerous talks in chambers and I just want to make sure that everything's on *702 the record that has developed thus far. The Defense originally approached the Court about testing numerous items with regard to the DNA testing. One of the things I just wasn't sure if it got officially put on the record is that the Court, in its discretion, chose the items that we felt had the most likelihood of having a third party perpetrator's DNA on it as well as a nexus to Mr. Norwood in his habit of moving around pillows. As a result, I believe the initial granting or the initial order was simply for the quant testing of the pillows and that was over our original request. When Mr. Davis learned that that testing was going to take longer than we had originally anticipated, we, as you know, asked to withdraw our request for the DNA testing and to proceed for trial on Monday. I want to just make note that the State's motion for continuance is based on DNA that they resisted testing. Although they mentioned it in the public starting in, I think, 2012, did not initiate it and is now relying on that for their continuance motion.
THE COURT: All right. I'm going to-as far as the assertion that the State resisted testing, I'm not going to agree that that's what we've concluded.
[Defense counsel]: Well, the State did not initiate testing.
THE COURT: You can assert it, but I'm not concluding that.
[Defense counsel]: Well, it was the Defense that initiated the testing in this case.
THE COURT: Fine.
Defense counsel then sought clarification from the district court about the scope of the testing:
[Defense counsel]: Just on the DNA matter so that we're clear for the record as well, is it the Court's order at this time that all items of evidence related to the murder of Natalie Antonetti be tested for DNA and compared to Mr. Davis, Marty Odem, as well as Mark Norwood?
THE COURT: Yes.
....
THE COURT: Okay. So what I want them to do is analyze everything. If they can't test it because it's degraded, contaminated, or doesn't have any DNA indicators at all, I want to know that, but I want us to be thorough here because I don't want to be sitting in this chair five years from now, ten years from now looking at some late discovery that says, oops, we made a mistake, because I've paid attention to Michael Morton and we're not going to go there.
[Defense counsel]: Yes, sir.
THE COURT: So I want everything tested.
[Prosecutor]: Yes, Judge.
There is no record of any hearings after the December 4 hearing. But before setting aside the indictment on September 9, 2015, the district court signed several orders as to the pending DNA testing, including:
12/08/2014 order directing Cellmark Forensics to compare the sample of Mark Norwood already in their possession to the profiles extracted from items already submitted for testing
12/13/2014 order directing APD to provide all latent lift print cards in this matter to Cellmark for DNA testing
12/17/2014 order directing Cellmark to conduct DNA testing of items listed on price quote and directing Travis County to remit $53,195 payment for the testing
12/30/2014 order directing APD to provide buccal swabs of John Goudie, the victim's son, to Cellmark for DNA testing
12/17/2014 order directing Cellmark to conduct DNA testing of latent print *703 cards listed on price quote and directing Travis County to remit $10,360 payment for the testing
04/17/2015 order directing Cellmark to compare DNA profile of Mark Norwood to the evidence submitted in the case
Defense counsel sent e-mails to Cellmark requesting status reports on the DNA testing in January, February, April, and May 2015. Cellmark provided preliminary results of its testing on April 17, 2015. That afternoon, the State sent an e-mail notifying Cellmark that "all parties agreed" to have the lab proceed with testing and comparison on "all suitable items," except certain latent prints, a paper note left by the victim, and hairs from a pipe.
Davis's trial did not occur as scheduled on May 4, 2015.[2] But the district court's findings specified that "[t]he record does not indicate a deliberate attempt [by the State] to delay the trial." The record shows that Cellmark issued a report of its completed DNA test results on May 12, 2015, and issued a supplemental report on May 13, 2015. Rather than requesting a speedy trial once the testing was finalized, Davis filed an amended motion to set aside the indictment on speedy-trial grounds on July 14, 2015. The record does not reflect that the district court set a hearing on Davis's amended motion to set aside the indictment, that the court reset the case for trial after May 4, 2015, or that it determined whether the State was prepared to proceed before granting Davis's motion and setting aside the indictment on September 9, 2015. The record shows that the DNA testing was complicated and piecemeal. The district court issued multiple orders for testing from July 16, 2014, through April 17, 2015. Further, under applicable discovery rules, the case could not have been reset for at least another thirty days after the final DNA results were received. See Tex. Code Crim. Proc. art. 39.14(b). Given the scope and complexity of the testing and resulting analysis, we cannot conclude that the period from the completion of the DNA testing to the dismissal of the indictment constituted an unreasonable delay, nor that such a delay was attributable to the State, supporting the district court's ruling.
The evidence in this record, viewed in the light most favorable to the district court's ruling, shows that the post-mandate reasons for delay included the appointment of Davis's new counsel, the court's crowded trial docket, Davis's motion for DNA testing, the State's motion for continuance for completion of DNA testing, the issuance of clarifying orders as to the DNA testing, and Cellmark's delay in completing the DNA testing. Of these reasons, we conclude that the appointment of new counsel was a justified delay, and that the court's crowded docket and the DNA lab delay are factors that weigh against the State, but not heavily on these facts. We further conclude that the weight assigned to the delay from State's motion for continuance for completion of DNA testing is balanced out by Davis's initiation of the request for DNA testing, the benefit of having DNA testing, and the court's decision as to the necessity of having "everything" tested for DNA before the retrial. Davis's initial motion seeking testing persuaded the court that even more extensive DNA testing was warranted, and Davis agreed at the December 1, 2014 hearing that waiting for the DNA test results was "the best course of action." Under these circumstances, we conclude that the reason-for-delay factor does not *704 weigh against the State under any time frame of the case.
Assertion of right to speedy trial
The defendant's assertion of his right to a speedy trial-the third Barker factor-is entitled to strong evidentiary weight in our determination of whether the defendant has been deprived of that right. See Balderas , 517 S.W.3d at 771 (citing Gonzales v. State , 435 S.W.3d 801, 810-11 (Tex. Crim. App. 2014) ). A speedy-trial demand should be unambiguous. Henson , 407 S.W.3d at 769. A defendant's failure to timely demand a speedy trial indicates strongly that he did not really want one. Balderas , 517 S.W.3d at 771 (citing Dragoo , 96 S.W.3d at 314 ). The longer the delay " 'the more likely a defendant who wished a speedy trial would be to take some action to obtain it.' " Id. (quoting Dragoo , 96 S.W.3d at 314 ). Thus, " 'inaction weighs more heavily against a violation the longer the delay becomes.' " Id. Filing a motion to dismiss instead of a motion for a speedy trial will generally weaken a speedy trial claim because it shows a desire to have no trial instead of a speedy one. Cantu , 253 S.W.3d at 283 (citing Zamorano , 84 S.W.3d at 651 n.40 ). However, seeking only dismissal will not necessarily result in a waiver of the claim. Phillips v. State , 650 S.W.2d 396, 401 (Tex. Crim. App. 1983) (noting that "[i]n some cases, defense counsel may legitimately feel that a long delay has caused a client so much prejudice that dismissal is warranted, even if the State is belatedly ready to move promptly"). " '[E]ach case must turn on its own facts, and the particular relief a defendant seeks is but one fact to consider.' " Zamorano , 84 S.W.3d at 651 n.40 (quoting Phillips , 650 S.W.2d at 401 ).
The State contends that the district court erred by concluding that Davis timely raised his right to speedy trial in a motion to dismiss. Davis first raised his speedy-trial claim in a motion to dismiss filed in the time frame between mandate and dismissal, on October 1, 2014-more than five years after his indictment (and after he had already been afforded a trial and an appeal). However, the district court determined that Davis adequately asserted his right to a speedy trial, reasoning:
Dennis Davis did not demand a speedy trial before the original trial but did formally assert[ ] his desire for a speedy trial on October 1, 2014. Davis reiterated his desire for a speedy trial in December, 2014. The State argues that Davis failed to diligently assert his right and therefore did not actually want a speedy trial. A number of appellate cases consider this a crucial point. However, Davis did not engage in any of the acts generally found to be indicative of this (such as seeking continuances, filing a motion to dismiss on the eve of trial, etc.). Although trial counsel took no action to seek a speedy trial, he later acknowledged he did not inform Davis of his speedy trial rights, and has been found ineffective in two other critical areas of representation. In this regard, see Dragoo v. State , 96 S.W.3d 308 (Tex. Crim. App. 2003), in which the Court of Criminal Appeals considered a delayed assertion of the right with the comment: "Here, appellant failed to assert his speedy trial right for 3½ years, until just before trial, although he was represented by counsel at all relevant times and no question is raised as to the competency of such counsel ." Id[.], p[.] 314-15, emphasis supplied.
Conclusions of law regarding assertion of the right: Based on the totality of the circumstances in this case, the Court finds Dennis Davis adequately asserted his speedy trial right.
Contrary to the court's finding, nothing in the record shows that Davis's counsel in *705 the first trial "acknowledged" that he did not inform Davis of his speedy-trial rights. The only source related to that assertion is Davis's own affidavit, in which he states that his first trial counsel "never informed [him] of [his] right to speedy trial or [his] ability to file a motion asserting those rights." Further, we may not infer that Davis's counsel in the first trial failed to inform Davis of his speedy-trial right based only on counsel being found ineffective in other aspects of his representation; such allegations must be firmly founded in the record. See Crocker v. State , 441 S.W.3d 306, 313-14 (Tex. App.-Houston [1st Dist.] 2013, pet. ref'd) (rejecting contention that trial counsel was ineffective for failing to pursue speedy-trial claim because record was silent concerning counsel's strategy); Dean v. State , No. 12-03-00074-CR, 2004 WL 1486154, at *5, 2004 Tex. App. LEXIS 5981, at *15-17 (Tex. App.-Tyler June 30, 2004, pet. ref'd) (mem. op., not designated for publication) (noting that defendant cannot meet his burden of showing counsel was ineffective for failure to pursue speedy-trial claim if record does not affirmatively support such claim); see also Lopez v. State , No. 02-15-00254-CR, 2016 WL 4474341, at *2-3, 2016 Tex. App. LEXIS 9371, at *7 (Tex. App.-Fort Worth Aug. 25, 2016, no pet.) (mem. op., not designated for publication) (noting that in absence of developed record ineffective assistance will not be inferred).
Additionally, the district court did not consider the adequacy of Davis's new counsel's efforts. See State v. Ritter , No. 06-17-00069-CR, 2017 WL 4287894, at *4, 2017 Tex. App. LEXIS 9095, at *12 (Tex. App.-Texarkana Sept. 28, 2017, no pet. h.) (noting efforts made by newly appointed counsel to assert defendant's right to speedy trial with reasonable promptness after prior counsel had not asserted that right). The record reflects that Davis's new trial counsel filed a "Motion to Dismiss for Want of Speedy Trial" on October 1, 2014, approximately seven months after being appointed. Davis filed two more motions that also prayed only for dismissal of the indictment: a November 19, 2014 "Motion to Set Aside Indictment for Failure to Afford Constitutional Right to Speedy Trial," and a July 14, 2015 amended "Motion to Set Aside Indictment for Failure to Afford Constitutional Right to Speedy Trial." See Cantu , 253 S.W.3d at 281 (noting that "[t]he constitutional right is that of a speedy trial, not dismissal of the charges"); Phillips , 650 S.W.2d at 401 ("Although a motion to dismiss notifies the State and the court of the speedy trial claim, a defendant's motivation in asking for dismissal rather than a prompt trial is clearly relevant, and may sometimes attenuate the strength of his claim.").
In the motions, Davis contended that the State caused his trial to be postponed because of its delayed cooperation with DNA testing. Davis did not acknowledge that he initially requested such testing and that he ultimately acquiesced to obtaining the results of that testing before his retrial. See, e.g. , Pady v. Thaler , C.A. No. C-10-089, 2010 WL 4923466, at *9-10, 2010 U.S. Dist. LEXIS 125359, at *25-27 (S.D. Tex. Sept. 16, 2010) (noting that one reason defense counsel elected to postpone start date of trial was to await results of DNA testing and defendant's failure to pursue his right to speedy trial "with zeal" weighed against him as to assertion-of-right factor); Ryan v. State , No. 01-10-00138-CR, 2011 WL 286140, at *6, 2011 Tex. App. LEXIS 676, at *15-16 (Tex. App.-Houston [1st Dist.] Jan. 27, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding that defendant acquiesced to delay from State's continuance of trial for further DNA testing by his agreement to reset case).
*706 Although Davis initially indicated a willingness to forgo DNA testing of various items when results were unavailable in time for the first trial setting on December 8, 2014, the record shows that the defense gave mixed reactions and ultimately acquiesced to the delay to obtain the results of DNA testing ordered by the district court. At a status-review hearing held December 1, 2014, the State notified the court that it would file a motion for continuance to complete DNA testing before trial, and the district court stated that waiting for the DNA results would be in the best interest of all parties. But the record reveals conflicting intentions between Davis and his counsel on whether to agree to the delay for DNA testing or to oppose the delay and insist on a speedy trial:
THE COURT: I've been advised that the State is going to file a motion for continuance at this point asking that the DNA testing be completed prior to trial. I've had some discussion in-camera, that is, in my office, with the State's attorney and your attorneys about the kind of delay that that testing is going to cause, and I have concluded that it's in the best interest of justice to grant the State's motion for a continuance in this case and reschedule this matter.
....
THE COURT: So I think that we're all better served by having the DNA results here because I think that if we went to trial without those results and then we get results six months down the road and they're important, then everybody's going to look pretty foolish, and I wouldn't want you to be in the penitentiary if you went to trial without those DNA results and found out that there's a mistake. I think that would be the worst possible outcome here. So I'm convinced that it's in everyone's long-term best interest to get the testing done. Then we can go to trial with a clear conscience and everybody can know they've done everything possible. Yes, sir?
THE DEFENDANT: I agree with you. I think that is the best course of action.
THE COURT: Okay.
THE DEFENDANT: Because it gives finality to everybody involved, not just me, but the victim's family-you know, to leave it open-ended-if we don't do this now, it will never get done. I firmly believe that.
But defense counsel added that Davis's agreement to testing did not waive his speedy-trial claim:
[Defense counsel]: And I'm going to-if I can, for the record, I think Mr. Davis is accepting the Court's decision, however we are asserting our speedy trial rights now, we are intending to assert them on Thursday [the December 4th pretrial hearing], and we are not waiving those.
THE COURT: Okay. And I understand that. And that's a given. And one of the things that we have discussed back in chambers is that I'm not going to rule on that speedy trial motion at this time.
THE DEFENDANT: Yes.
Davis then reemphasized the importance of DNA testing and his willingness to wait for the completion of such testing:
THE DEFENDANT: May I speak now?
THE COURT: Absolutely.
THE DEFENDANT: When I was under the understanding that the DNA testing, first, it would have been ready by trial, the first phase, to determine whether any further testing would have been done, but then I found out that the first phase wouldn't have been ready for who knows how long, you know, I just thought rather than have this dragged *707 out forever, I just wanted to go ahead and proceed without the DNA, but if they're going to test that DNA, all the DNA, including the fingerprints-
THE COURT: I'm going to order that every bit of evidence that's available for testing be tested.
THE DEFENDANT: -then that's different.
THE COURT: Okay.
THE DEFENDANT: I can go with that.
At that hearing, the court also stated its intent to reset the case for trial on May 4, 2015, and noted that the number of cases already on the docket made it unlikely that trial would occur before the intended reset date, which defense counsel accepted:
THE COURT: But it's only fair for you to know what we've been talking about [in chambers], and so I'm thinking that we're going to reset this case for trial. Did y'all decide? Is the week of May 4th [2015] acceptable?
[Prosecutor]: Yes, Judge, that's fine.
[Defense counsel]: Other than for the record we're asking for as fast a trial as we can. If that's the fastest trial we can, then that's what we will accept.
THE COURT: That's as fast as I think we can reasonably get all of this done.
....
THE DEFENDANT: Should the first phase of the DNA testing come back and there's no further testing possible, would it be possible to expedite the trial?
THE COURT: Well, we'll cross that bridge when we get there. Let me just tell you-
THE DEFENDANT: Just a possibility.
THE COURT: -that that would be a very slim possibility because of the number of other cases that I've already got set for the first part of the year.
THE DEFENDANT: I understand.
Finally, Davis reiterated his appreciation of the district court for ordering the testing:
THE DEFENDANT: I'm just deeply moved that you're going to do this. I mean, it gives me the opportunity to prove my innocence and also to maybe make this whole ordeal count for something. Thank you.
THE COURT: Yes, sir. It is-it's my feeling that justice will be best served in this case if we all know the facts.
THE DEFENDANT: We're doing everything we can.
THE COURT: I think that is my overriding concern here. So, thank you, sir.
[Defense counsel]: Thank you, Judge.
The evidence in this record, viewed in the light most favorable to the district court's ruling, shows that Davis's assertion of his right to speedy trial was ambiguous at best. Cf. Henson , 407 S.W.3d at 769 (noting that speedy-trial demand should be unambiguous). Davis initiated the request for DNA testing and, after discussion with the district court, Davis ultimately acquiesced to the delay caused by waiting for the DNA test results because he thought it was "the best course of action." See ids="7091965" index="101" url="https://cite.case.law/sw3d/407/764/#p766">id. (noting that defendant's agreement to resets of trial was inconsistent with actions of one seeking to preserve and protect his right to speedy trial). Additional delay occurred at the independent lab during its DNA-testing process and, as late as April 17, 2015, "all parties agreed" to have the lab proceed with testing (with the exception of certain identified items).
We conclude that Davis did not assert his right to speedy trial during the periods from indictment to issuance of the appellate mandate. During the time following the issuance of this Court's mandate and *708 leading up to the district court's order setting aside the indictment, Davis acquiesced to the delay from the prolonged wait for results of DNA testing that he initiated. As such, the assertion-of-right-to-speedy-trial factor weighs against Davis.
Prejudice from delay
In analyzing the prejudice to the defendant because of the delay-the fourth Barker factor-we consider the three interests of defendants that a speedy trial is designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. Balderas , 517 S.W.3d at 772 (citing Gonzales , 435 S.W.3d at 812 ). The last type of prejudice is most serious "because the inability of a defendant to adequately prepare his case skews the fairness of the entire system." Barker , 407 U.S. at 532, 92 S.Ct. 2182 ; Cantu , 253 S.W.3d at 285. A defendant bears the burden of making some showing of prejudice, but a showing of actual prejudice is not required. Balderas , 517 S.W.3d at 772 (citing Munoz , 991 S.W.2d at 826 ). In cases with excessively lengthy delays to which the defendant does not acquiesce, an inference of actual prejudice may arise. See Hopper , 520 S.W.3d at 929 (noting that any presumptive prejudice due to passage of time was extenuated by defendant's acquiescence to delay); Zamorano , 84 S.W.3d at 654 (concluding that length of delay itself supported inference of actual prejudice). Such inference of prejudice does not arise here because, as discussed, Davis acquiesced to the trial delay for DNA testing results.
In considering the factor of prejudice from the delay, we consider only the prejudice shown since the issuance of the appellate mandate. As we have discussed, during the time between Davis's indictment and his first trial, Davis did not assert his right to speedy trial, did not assert prejudice from that delay, and the trial afforded him his speedy-trial right. We have also noted that during the time between Davis's conviction and the issuance of mandate while his appeal was pending, Davis would have had no reason to assert a speedy-trial right, and he was not prejudiced by the appeal but ultimately benefitted from it by securing reversal of his conviction and a new trial.
As to the factor of prejudice, the district court found that "[c]ritical prejudice" to the defense happened in February 2013 when witness Donn Chelli died. The court concluded that "Chelli was the linchpin of the third party perpetrator defense. Because of his death, the possibility of fully and effectively litigating this issue is forever foreclosed." The State contends that the district court erred by determining that Davis was prejudiced by the Chelli's unavailability and by giving disproportionate weight to the factor of prejudice. The State correctly notes that because Chelli died before the reversal of Davis's conviction, his death could not have been a basis for prejudice from the delay of Davis's retrial.
1. Witness unavailability
In its assessment of prejudice, the district court found that other evidence tending to show prejudice "pale[d] in comparison with the fact that the witness Donn Chelli died during the pendency of this case." The court described Chelli as "the linchpin of" Davis's defense and detailed the potential materiality of the testimony Chelli could have provided to the case. Although Chelli's testimony could have been material to Davis's case, his unavailability does not demonstrate prejudice resulting from a violation of Davis's speedy-trial right. The record shows that Chelli died during the pendency of the Davis's appeal from his 2011 conviction. Further, the law is well settled that a *709 defendant should not be able to "reap the reward of dismissal for failure to receive a speedy trial" for delay caused by his own appeal. Brillon , 556 U.S. at 90, 129 S.Ct. 1283 (quoting Loud Hawk , 474 U.S. at 316, 106 S.Ct. 648 ). Because Chelli's unavailability arose during the pendency of Davis's appeal, a period of delay attributable to Davis and not the State, it was not a factor in determining whether Davis suffered prejudice sufficient to demonstrate a speedy-trial violation. See id. ; see also Deeb v. State , 815 S.W.2d 692, 706 (Tex. Crim. App. 1991) (concluding that delay was not attributable to State and that no prejudice was shown by witnesses' unavailability because there was no evidence that witnesses were unavailable as result of delay); McGregor v. State , 394 S.W.3d 90, 116 (Tex. App.-Houston [1st Dist.] 2012, pet. ref'd) (no prejudice shown by witness unavailability where there was no evidence that witness died during delay at issue).
2. Anxiety and concern
Chelli's death was not the only basis for the prejudice alleged in Davis's speedy-trial motion or the district court's ruling. See Cantu , 253 S.W.3d at 280 (stating that reviewing courts consider evidence presented at speedy-trial hearing in light most favorable to trial court's ultimate ruling); Shaw , 117 S.W.3d at 889 (stating that reviewing court must uphold trial court's ruling when it is supported by record and correct under applicable law). Davis's motion to dismiss included sworn affidavits from Davis with his unchallenged allegations of the prejudice that he sustained from the delay since mandate issued, including that the delay of his new trial harmed him "physically, psychologically, emotionally, and economically"-i.e., caused him anxiety and concern. The district court specifically found that the prejudice to Davis included the "harmful effects on his physical and mental health, his home life and his financial security (as set forth in his uncontroverted affidavits attached to the speedy trial motion)." See Zamorano , 84 S.W.3d at 654 (concluding that because State did not challenge defendant's testimony, it was at least some evidence of type of anxiety that is considered under prejudice prong of Barker test); see also Stock v. State , 214 S.W.3d 761, 767 (Tex. App.-Austin 2007, no pet.) (considering evidence on defendant's assertions of prejudice that State did not rebut).
Davis's filed affidavits set forth the problems he has experienced while his retrial was pending, including his continued listing as a convicted felon with state and federal law-enforcement agencies and "recent" heart attacks. He further states in some detail how his health care, housing arrangements, financial situation, and employment opportunities were adversely affected. Based on this unchallenged evidence, the district court could have reasonably found that Davis met his burden of making "some showing of prejudice" from the delay-showing his anxiety and concern-under the Barker test. See Balderas , 517 S.W.3d at 772-73 ; Zamorano , 84 S.W.3d at 654-55 ; Cantu , 253 S.W.3d at 286 (collecting cases and noting that sufficient evidence of prejudice may be shown by disruption of employment, draining of financial resources, and personal anxiety, which are among "major evils protected against by the speedy trial guarantee"). We conclude that the prejudice factor weighs in favor of Davis.
Balancing of Barker factors
Having addressed the four Barker factors, we are instructed to balance them. Balderas , 517 S.W.3d at 773. We must apply this balancing test "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has *710 been infringed." Id. On this record, as discussed, the Barker factors do not weigh in favor of a speedy-trial violation during the time from indictment to first trial or during appeal of the first trial to the appellate mandate. During the time following the appellate mandate, the first and fourth Barker factors weigh in favor of the requested relief but the second and third Barker factors weigh against it.
As to the first factor, the length of the delay, considering the procedural history as a whole, the six-year-plus length of delay is presumptively prejudicial and weighs against the State. However, the second factor, the reason for the delay, included extensive intervals of time that do not weigh against the State-e.g., the time during which Davis never asserted his speedy-trial right, the time that elapsed for the first trial, and the time spent during appeal of his conviction. The reason for the remaining delay-the eighteen months between the March 6, 2014 issuance of mandate and September 9, 2015 order setting aside Davis's indictment-was primarily due to the prolonged wait for the results of DNA testing. That testing was initially requested by Davis and was expanded in scope by the district court. The State sought a continuance for completion of DNA testing, which the district court granted after informing the parties that the court was of the opinion that waiting on the test results was in the best interest of all parties. Delays at the DNA-testing laboratory and the delay due to the district court's crowded dockets do not weigh heavily against the State. By contrast, the third factor, the defendant's assertion of the speedy-trial right, weighs against Davis. Davis never asserted his speedy-trial right before the appellate mandate. After his new trial counsel was appointed, Davis asserted the right-albeit in motions praying only for dismissal of the indictment-but the record shows repeated instances in which Davis acquiesced to waiting for the completion of DNA testing and obtaining the results of that testing before his retrial, which weighs against him. Finally, as to the fourth factor of prejudice, Davis provided unchallenged evidence of some prejudice from the delay since mandate, showing his anxiety and concern, which weighs in his favor.
We conclude that the Barker factors balanced together weigh against a determination that Davis was denied his right to a speedy trial. See ids="12380875" index="127" url="https://cite.case.law/sw3d/517/756/#p768">id. Accordingly, we sustain the State's issues contending that the court abused its discretion by dismissing Davis's indictment for violation of his right to a speedy trial.
CONCLUSION
We reverse the district court's order setting aside Davis's indictment and remand this cause for further proceedings consistent with this opinion.
CONCURRING OPINION

We note the sparsity of cases setting forth the beginning and ending dates for calculating the length of delay when the defendant has received a trial, appealed, obtained reversal of his conviction, and then the cause is remanded for a new trial. In the interest of justice, we have considered the length of the delay using the greatest possible time span, running from Davis's indictment to the dismissal of his indictment. See Emery v. State , 881 S.W.2d 702, 708 (Tex. Crim. App. 1994) (calculating length of delay from defendant's indictment to his second trial); but see Soffar v. State , No. AP-75363, 2009 WL 3839012, at *39 (Tex. Crim. App. Nov. 18, 2009) (not designated for publication) (concluding that "speedy-trial clock began to run, at the earliest, on the date that [defendant]'s conviction and sentence were reversed"). In accordance with Texas Rule of Appellate Procedure 77.3, we have not relied upon the speedy-trial analysis in Soffar , an unpublished case by the Texas Court of Criminal Appeals. See Tex. R. App. P. 77.3 ("Unpublished opinions have no precedential value and must not be cited as authority by counsel or by a court.").

Both parties agree that the trial date was passed by the district court and that the reason for doing so is not reflected in the record.