# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00602-CR

**The State of Texas, Appellant**

**v.**

**Isaac Wesley Brandley, Appellee**

### FROM COUNTY COURT AT LAW NO. 2 OF COMAL COUNTY
### NO. 2016CR1824, THE HONORABLE CHARLES A. STEPHENS II, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In February 2016, appellee Isaac Wesley Brandley was arrested for assault causing injury/family violence and released on bond. In August 2019, the trial court granted Brandley's Motion to Set Aside the Information based on violations of his right to a speedy trial. The State of Texas then filed this appeal. We affirm the trial court's order granting Brandley's motion.

### STANDARD OF REVIEW

Both the federal and state constitutions guarantee an accused the right to a speedy trial. *Zamorano v. State*, 84 S.W.3d 643, 647 (Tex. Crim. App. 2002). "A speedy trial protects three interests of the defendant: freedom from oppressive pretrial incarceration, mitigation of the anxiety and concern accompanying public accusation, and avoidance of impairment to the accused's defense." *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). The right to a speedy trial "attaches once a person becomes an 'accused'—that is, once

he is arrested or charged," and we review a trial court's decision on a speedy-trial claim "'on an ad hoc basis' by weighing and then balancing the four *Barker v. Wingo* factors: 1) length of the delay, 2) reason for the delay, 3) assertion of the right, and 4) prejudice to the accused." *Id.* (quoting *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972)). "The *Barker* test is triggered by a delay that is unreasonable enough to be 'presumptively prejudicial,'" *id.* at 281 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)), and although there is "no set time element that triggers the analysis," *id.*, courts generally "deem delay approaching one year to be "unreasonable enough to trigger the *Barker* enquiry," *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (quoting *Doggett*, 505 U.S. at 652 n.1).

In reviewing a trial court's ruling on a defendant's speedy-trial claim, "we apply a bifurcated standard of review: an abuse of discretion standard for the factual components, and a de novo standard for the legal components." *Zamorano*, 84 S.W.3d at 648. We weigh the strength of each *Barker* factor and "balance[e] their relative weights in light of 'the conduct of both the prosecution and the defendant.'" *Id.* (quoting *Barker*, 407 U.S. at 530). No one factor is a "necessary or sufficient condition" to finding a speedy-trial violation, and the four related factors "must be considered together along with any other relevant circumstances." *Id.* (quoting *Barker*, 407 U.S. at 533). We apply the balancing test—which, while necessarily involving fact findings and legal conclusions, is a "purely legal question"—"with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Cantu*, 253 S.W.3d at 281. We defer not only to the trial court's resolution of disputed facts but also to its "right to draw reasonable inferences from those facts." *Id.* at 282. The trial court may disbelieve any evidence so long as there is a reasonable and articulable basis for doing so, including completely disregarding

2

uncontroverted testimony based on the court's evaluation of the witnesses' credibility and demeanor, and "all of the evidence must be viewed in the light most favorable to" the court's ruling. *Id.* When, as in this case, the trial court grants a motion to dismiss, we presume that the court resolved all disputed fact issues in favor of the defendant and defer to any findings of fact that the record supports. *See id*.

The State has the burden of justifying the delay, while the defendant must show his assertion of the right and prejudice. *Id*. at 280. "[T]he greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Id*. at 280-81. Whether and how a defendant asserts his right to a speedy trial "is closely related to the other three factors," and his "assertion of his speedy-trial right (or his failure to assert it) is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id*. at 282-83. Filing for dismissal instead of a speedy trial generally weakens a speedy-trial claim because it "shows a desire to have no trial instead of a speedy one." *Id*. In considering prejudice, we bear in mind the interests protected by the right to a speedy trial: "(1) to prevent oppressive pretrial incarceration, (2) to minimize the accused's anxiety and concern, and (3) to limit the possibility that the accused's defense will be impaired." *Id*. at 285.

## PROCEDURAL BACKGROUND

*2016-2017*

Brandley was arrested February 10, 2016, and released on bond the next day. On December 16, 2016, he was charged by information with misdemeanor Assault Causing Bodily Injury, Family Violence, *see* Tex. Penal Code § 22.01(a)(1), and counsel was appointed in March

3

2017. In April 2017, Brandley filed a waiver of arraignment stating that he was entering a plea of not guilty that included a statement that he "requests a speedy trial."

*2018*

The case was first set for trial on June 12, 2018. In May 2018, Brandley filed a motion in limine and a Request for Notice of State's Intention to Use Evidence of Extraneous Offenses at Trial. Also in May, the parties agreed to reset the case to a July 17, 2018 jury trial setting. In June, the State informed Brandley of prior convictions it intended to use, and in early July, it filed a notice of its intention to use certain prior convictions to enhance the range of punishment. On July 9, Brandley filed a motion for continuance, stating that counsel was still investigating, was "waiting for records to be released," and was scheduled to attend continuing legal education July 12 and 13 and would be unable to adequately prepare for trial. The following day, counsel asked that an investigator be appointed to find two potential witnesses, and the court granted the request. On October 29, Brandley filed a motion in limine and a motion seeking to bar the State from mentioning "non-jurisdictional enhancement counts," and on October 30, the parties appeared at a docket call and stated that they were ready for trial. The case did not proceed to trial, and the record does not reflect the reason for that, but Brandley and his attorney signed a form resetting the case for a March 19, 2019 trial date.

*2019*

On March 14, 2019, the State filed a motion for continuance, stating that the complainant and her daughter had not appeared for a scheduled meeting with the prosecutor and were not returning phone calls. The State asserted that the witnesses' uncooperativeness might be due to Brandley's "wrongful actions" and said that it intended to file a motion for forfeiture

4

by wrongdoing seeking to be allowed to "admit prior statements of these witnesses." *See* Tex. Code Crim. Proc. art. 38.49 (party to criminal case who "wrongfully procures the unavailability" of witness forfeits right to object to admission of evidence or statements based on witness's unavailability). On March 18, Brandley sent the State a letter requesting "all *Brady* information applicable in this case," including any statements by the complainant "regarding her involvement in this case and past cases involving [Brandley] that may be exculpatory or mitigating," any statements by the complainant "indicating that she did not want to testify or participate in this or previous proceedings," any evidence that the complainant "has made similar allegations against others that did not result in arrests or prosecution," and any evidence that the complainant "may not have been truthful or credible in past statements."[1] The prosecutor responded the next day, stating she "was not aware of any exculpatory or mitigating statements made by the victim in relation to her involvement in this case or any other against" Brandley other than a 2015 charge that resulted in a Non-Prosecution Agreement (NPA), which the prosecutor sent to Brandley's attorney. The prosecutor also complained that Brandley's requests for information about other allegations or for information indicating that the complainant may not have been truthful were seeking information "regarding specific incidents of conduct that would be absolutely

---

[1] Article 39.14 imposes on the State a "general, continuous duty" to disclose "any discovery evidence tending to negate the guilt of the defendant or reduce the punishment the defendant could receive." *Ex parte Martinez*, 560 S.W.3d 681, 702 (Tex. App.—San Antonio 2018, pet. ref'd). Brandley's counsel made a formal request for exculpatory material, and the State had an obligation to disclose possibly exculpatory information. *See* Tex. Code Crim. Proc. art. 39.14(a), (h) ("as soon as practicable after receiving a timely request from the defendant," State shall produce information, including written or recorded statements, in its possession, custody, or control "that constitute or contain evidence material to any matter involved in the action"; "Notwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.").

5

inadmissible for any purpose."[2]  The prosecutor stated that she did not have evidence "that would indicate that the victim may not have been truthful or credible," nor was she "aware of any similar allegations against others that did not result in arrest or prosecution."

On March 19, 2019, the case was called, and Brandley's attorney announced not ready, asking for a continuance because she had "received exculpatory evidence yesterday."[3] Counsel explained that she had just "received a Non-Prosecution Affidavit that her complainant in this case had signed in a previous case against my client acknowledging that she was mutually at fault in an assault she previously accused my client of committing.  That is absolutely exculpatory and I received it yesterday.  This was never turned over by the State to me."  Counsel further stated she had spoken to the complainant, who told counsel that she "did not remember everything in this case."  The complainant also said she had informed the State that "she didn't want to prosecute this case" but "had been told that if she didn't cooperate with them that she would be held in contempt."  Brandley's attorney asserted that such information was exculpatory

---

[2] The court of criminal appeals has stated that although the State "usually does not have a duty to turn over inadmissible evidence, the analysis might not end there," citing Fifth Circuit cases holding that "if inadmissible evidence would give rise to the discovery of other admissible evidence or witnesses, the State does have a duty to disclose that evidence."  *Ex parte Miles*, 359 S.W.3d 647, 669 n.22 (Tex. Crim. App. 2012) (citing *United States v. Brown*, 650 F.3d 581, 588 (5th Cir.2011); *United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004); *Sellers v. Estelle*, 651 F.2d 1074, 1077 n.6 (5th Cir. 1981)).

[3] In its briefing, the State asserts that it "withdrew the Motion for Continuance and announced Ready" at the March 19, 2019 trial setting.  As support for that assertion, it cites the reporter's record from the hearing on Brandley's motion to dismiss.  In that hearing, the prosecutor, in arguing that the delay in the case should be viewed as more Brandley's fault than the State's, asserted that "the State never filed—there is a filed Motion for Continuance, but on that day of March 19th, 2019, the State was, in fact, ready.  We had settled that prior to." However, the record does not indicate that the State withdrew its motion, either by motion or verbally at the March 19 setting, or that it announced "ready."  The State's motion was not mentioned in that hearing, in which Brandley's attorney made a verbal motion for continuance because she had "received exculpatory evidence yesterday."

6

but had not been disclosed. She also said that she had asked "about that and the State vehemently denies these occurrences." Counsel went on to state that she had spoken to the complainant's husband and "found out she's called the police on him in New Braunfels with New Braunfels police numerous times alleging he's assaulted her, which has never resulted in an arrest or conviction." Counsel had also learned that the complainant "sought a protective order through this district attorney's office against her current husband, but soon-to-be ex-husband and that . . . it was later determined it was not factually based and she had not been credible or truthful," leading the prosecutor to "drop[] that protective order against him." Counsel asserted that the State should be considered to know about the repeated police reports and the dropped protective order and that the information indicated that the complainant "had not been honest or truthful about allegations of assault against other persons." The prosecutor responded that she had "received a request last night at 5:30 in the evening" from defense counsel and that she had provided the NPA and a police report from the 2015 case "in an abundance of caution." The trial court agreed to continue the case and said, "[W]e'll reset it on the next docket."

On April 18, the State filed a motion in limine. On April 23, the parties appeared for a third trial setting, and Brandley's attorney asked the trial court to exclude recordings of 135 jail calls that the State had just turned over to her "the week before." Counsel noted that Brandley had been released from jail "back in 2016" and that the recordings had thus been accessible by the State since then. Asked why Brandley had not gotten the tapes earlier, the prosecutor said that she had not accessed the tapes until the day they were turned over and had not yet listened to all of them. She also said that because the complainant was being uncooperative, she did not know if she would seek to use them at trial, saying, "If I have to move forward with that Forfeiture by Wrongdoing because my victim doesn't show up I may

7

have to use those calls."[4]  The trial court said, "This is the second hearing and it seems we have had something like this before."  The State offered to reset the trial, and Brandley's attorney responded:

> Frankly, Your Honor, that puts me in a difficult position.  My client wants to go forward.  I have a witness that I have got under subpoena who intends to move out of state this summer.  If this keeps getting bumped I'm going to lose a witness.  This is going to absolutely harm this case.  We are asserting our right to a speedy trial.  We've continued to assert our right to a speedy trial.

The trial court said it would reset the case to be the first case on May 28, 2019, and counsel responded, "[O]ur other concern is we intend to go to Court for punishment and honestly we would prefer to go to this Court for punishment instead of a visiting judge."  The trial court then stated that its next jury trial would not be until July, and counsel said, "Your Honor, because of the situation I would ask that the Court to let us proceed at this time."  The court said, "I appreciate that.  This is the last time that I will do it," and counsel replied, "I would like to talk to my client to see if he would rather wait until the July setting.  It may be a situation where we will have to fly the witness back."  The trial court closed the discussion by saying, "The hearing would start on [July] 8th or the 9th.  If you want to talk to him that's fine with me.  I was just trying to get you heard as soon as possible."

In late June 2019, the State filed a Motion to Exclude Witness Testimony, and Brandley filed a motion for discovery of arrest and conviction records of the State's witnesses, asking the State to be ordered to examine the records of its local law-enforcement agencies, the Texas Crime Information Center, and the National Crime Information Center.  On July 2, 2019, the trial court called the case for pretrial motions, noting that the case was set for trial the

---

[4] It does not appear that the State filed a motion for forfeiture for wrongdoing; that motion was only referenced as a possibility in the State's motion for continuance.

8

following week, and signed orders granting several of the motions. On July 8, 2019, when the case was called, Brandley's attorney said that on July 5, the State had turned over "107 pages of additional discovery, some of which [she] believe[d] is exculpatory," including information about a fourth man that the complainant had accused of assault family violence. Counsel stated that the State had to have been aware of the information because it had filed an NPA in "the three cases against" that man. She also noted that in April, the State had disclosed the jail calls "the week of jury announcement," requiring that the case be reset, and that the trial court "admonished the State that they cannot continue doing this." Counsel said:

> This has been the third time now that there has been evidence that has been withheld twice, at least that had been exculpatory and here we are set for trial. The Court has informed us in chambers that he will continue the case one more time. I have filed, or I am filing this morning, a Motion to Set Aside Information for failure to afford my client's constitutional right for a speedy trial. Your Honor, he was arrested back in February of 2016 for this case. Subsequently he was charged, I believe, in December of 2016. We filed a waiver of arraignment in this case, Your Honor, April 18th, 2017. In that waiver of arraignment we requested a speedy trial of this case.

Counsel noted that "one major witness" had moved to Florida and would have to testify by videocall, saying "that is still a hindrance to this case not having that witness available to testify in person." In addition, she noted, "one of his other witnesses is now in TDC." The prosecutor responded that she did not think Brandley would be able to use the recently disclosed information because it would be improper impeachment evidence. The prosecutor also stated that Brandley's attorney had subpoenaed records from law enforcement on July 5, 2019; that the State "had no knowledge of [the records'] relevance"; that the State "ran a search for every time the victim has called 911"; and that the records were "immediately e-mailed" to Brandley. The trial court continued the case and stated that it would set Brandley's Motion to Set Aside

9

the Information for a later hearing, noting, "If you have subpoenaed somebody that has not previously been on radar from the State, then don't be surprised if you get records about that person otherwise."

On August 14, 2019, the court held a hearing on Brandley's motion and noted that the alleged offense took place in February 2016, saying, "So, we're actually looking at three-and-a-half years." Brandley was called to testify, and he agreed that he had been charged about ten months after the alleged offense; he had "been prepared to go to trial three times"; "there has been incidents as far as evidence being turned over from the State that have prevented that from going to trial those three times"; and the delay had prejudiced his case. Brandley said that he was required to report to his bonding agent regularly, explaining that at the beginning of the case he had to report weekly and that it was now monthly, and that he had come to court ten or twelve times. He said that he had been seeking employment and had been turned down because of the pending charge, testifying that several would-be employers had told him "they want [Brandley] to be done with [his] legal issues before they hire [him] on." He also provided the names of several of the businesses with which he had applied. The State asked Brandley if he wanted a trial and was ready to proceed the next day, and he answered, "Yes." Asked whether he was hoping for a trial from the beginning, he said, "Not really. I was just hoping that it would have been over with by now."

Brandley further testified that one of the witnesses he intended to call had moved to Florida and that although the trial court had been willing to arrange for that witness to testify through a video call, Brandley believed it would have been more beneficial for that witness to testify in person. In addition, one of his other witnesses was incarcerated and would have to testify "as a prison inmate." Brandley testified about what information the two witnesses would

10

be able to provide, explaining that the Florida man had been married to the complainant in the past, "communicated a lot" with her, "knows of her and her actions and how she can be," and knows that Brandley and the complainant had "stayed together." The incarcerated witness had been present during several "instance[s]" between Brandley and the complainant and a few times "had to come pick [Brandley] up to get [him] from over there. She actually followed [Brandley] to [the witness's] house and bust his back window out of his truck." Brandley said he was concerned that the jury would "view [that witness's] testimony as being irrelevant . . . by him being incarcerated." In closing, Brandley's attorney argued:

> Based on evidence before the Court you can see my client was arrested back in February 2016. We requested a speedy trial back in April of 2017. . . . [T]hat length of delay is . . . presumptively prejudicial . . . . No delay or no reasons have been put forth by the State for this delay. . . . Each of those have been due to some sort of fault on part of the State. . . . I found out the day before [the March 2018 trial setting] that there had been a previous case against my client wherein the State dismissed those charges. They were dismissed due to a Non-Prosecution Affidavit by the same complainant. At which point I notified the State that was clearly exculpatory and had not been disclosed. The State then later that day turned over their NPA where the victim did indicate she was mutually at fault, which is absolutely exculpatory and had not been turned over. The Court then granted a continuance based on that so we could further evaluate that.
>
> Then we had our next setting which was in April, the next month. At that point the State turned over 135, I believe, jail calls . . . . Those were turned over I believe at docket call or the day before docket call for trial. And once again at that point I told the Court we wanted to go forward with trial. We urged the Court to just strike those and not allow the State to put those calls into evidence so we could go forward. The Court at that point granted another continuance and urged the State not to turn over any more evidence that they discovered.
>
> Then we had another setting in July, Your Honor, this last setting where we— again, I issued two subpoenas before that date. One was for [the incarcerated witness] and one was to the New Braunfels Police Department requesting all records involving this complainant. . . . And shortly thereafter turned over, I believe it was right before docket call, again 107 pages of evidence which also revealed that this complainant had accused another man . . . of assault against her subsequent to my client's arrest. Those cases had been rejected by the State. I believe they were NPA'd by the State.

11

So, again, that would be exculpatory evidence if this complainant has made other allegations and then either recanted or the State did not believe those and dropped those cases. The Court, on your own motion, granted another continuance. Over a month passed or approximately a month passed, and you can see that in the last set of Defense Exhibit 4 where I had to contact the State saying I still had not received any of the records they were going to turn over it had been approximately a month.

At which point I received those records involving—actually I received the NPAs that are interoffice so I had no access to them . . . . It said there was nothing exculpatory of them. Then right after that I received a notice of where the victim again claimed this complainant acknowledged she had not been a victim of family violence, which is clearly exculpatory. I said, well, if you have got this then she must have made statements to that affect, which I was told there are numerous videos. I was told this morning that those videos are now ready for me, which is even more evidence and that is exculpatory in nature and should have been turned over months and months, if not over a year ago. I believe the incidents involving the third or fourth alleged assault happened back in September 2018. . . .

If you look at the letters from the State in response to my request for information you will see that in the very first letter that I received from the State that was, I suppose in response to my request for exculpatory and Brady evidence that was dated March 19th, 2019, the State asserts . . . I am not aware of any similar allegations against others that did not result in arrest or prosecution. Since that time we found out that there's at least two others that were in their office that they absolutely would have had knowledge of and we did not receive until—well, frankly, I'm still receiving—have not received yet.

At this point I would assert that my client has been denied his right to a speedy trial. He has proved that he has been prejudiced by that denial of that right due to the State's fault and I would ask that his case be dismissed.

The prosecutor responded that the record shows "various amounts of agreed to resets pretrial." She further stated that the State had been ready to proceed on March 19, 2019, that it was Brandley's attorney who had sought a continuance to review discovery, and that Brandley's attorney had also filed another motion for continuance because she had to attend a CLE. The prosecutor argued, "As far as each setting I would argue that that should not be counted against either party," and stated that there were several trial dates available "prior to October which the State would be ready for." As for the discovery issues, the prosecutor said:

12

Each and every time I became aware of new information it was turned over to [Brandley's attorney]. I do understand that it was turned over relatively close because that is when, like she said, with the subpoenas for Mr. Peavyhouse and NBPD, that is when I began that investigation. But immediately as soon as I found out I turned it over. . . . As far as the prejudice I would argue that [Brandley] has not shown any unavailability of witnesses. I would like to submit to the Court different case law regarding the prejudice of employment. And finally for the assertion of the right to dismiss for a speedy trial [Brandley] has filed a Motion to Dismiss as opposed to a Motion For A Speedy Trial, which there's plenty of case law that suggests—that weighs heavily against the Defense.

A second prosecutor asserted that none of the discovery is exculpatory because whether the complainant had made other accusations that had been dismissed was "patently irrelevant and immaterial to the charge before us and inadmissible." He argued, "I don't believe that the State's efforts to comply with [counsel's] continued requests and give her more information as she's requested information should in any way be held against the State for speedy trial reasons."

## DISCUSSION

Whether a delay provokes a speedy-trial inquiry depends on the circumstances of the case. *Zamorano*, 84 S.W.3d at 648-49; *State v. Davis*, 549 S.W.3d 688, 697 (Tex. App.—Austin 2017, no pet.). "The nature of the charged offense is considered—for instance, 'the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.'" *Davis*, 549 S.W.3d at 697 (quoting *Zamorano*, 84 S.W.3d at 649). And "the presumption that pretrial delay has prejudiced a defendant intensifies over time." *Id*.

1. *Length and Cause of Delay*

The forty-two-month delay in this case stretched well past the eight- to twelve-month trigger point generally employed in speedy-trial analyses. *See Doggett*, 505 U.S. at 652 n.1 (courts "have generally found postaccusation delay 'presumptively prejudicial' at least as it

13

approaches one year"); *Zamorano*, 84 S.W.3d at 656 ("eight months to a year has generally been considered the minimum to trigger a speedy trial analysis"). The first factor—the length of the delay—weighs heavily against the State. *See, e.g.*, *Dragoo*, 96 S.W.3d at 314 (three and one-half year delay "stretched far beyond the minimum needed to trigger the [speedy-trial] enquiry" and thus "weigh[ed] heavily in favor of finding a violation of the speedy trial right"); *Zamorano*, 84 S.W.3d at 649 ("Because the length of the delay stretched well beyond the bare minimum needed to trigger judicial examination of the [speedy trial] claim, this factor—in and of itself—weighs heavily against the State."). We now consider whether the State carried its burden of justifying the delay. *See Cantu*, 253 S.W.3d at 280-81; *Dragoo*, 96 S.W.3d at 314.

The record does not reflect why it took about ten months for Brandley to be charged after his February 2016 arrest, and that time thus weighs against the State, although not heavily. *See Cantu*, 253 S.W.3d at 280-81. The record contains numerous Case Reset Forms stretching from March 2017 through July 2019. Those resets are not explained, and the forms do not indicate that they were instigated by Brandley, only that they were agreed. We thus view that period of delay in a mostly neutral light, weighing it only slightly against the State. *See id.* The record also contains Brandley's motion for continuance of the July 16, 2018 trial setting, explaining that counsel was "still in the process of investigation and [was] waiting for records to be released." She also stated that she was scheduled to attend continuing legal education on July 12 and 13 and would be traveling on the weekend before the trial setting. We therefore weigh the interval between July 10, 2018, and October 30, 2018, against Brandley.

As for the remaining delay, when defense counsel sought a second continuance at the March 19, 2019 jury announcement hearing, she explained that she had received exculpatory evidence from the State the day before. She also complained that the State had not produced

14

other exculpatory evidence that they had or should have been aware of, asserting that the complainant had told her she did not want to prosecute the case and did not remember everything about the incident; that the complainant's soon-to-be-ex-husband had alleged that the complainant had made false reports of assault against him; and that the district attorney's office had dropped a protective order request by the complainant against her husband because the complainant "had not been credible or truthful." Then, in the July and August hearings, counsel asserted that the State had continued a similar pattern of turning over evidence mere days before the scheduled hearings.

Although the State asserts in its brief that it had a "valid reason" for each complained-of late disclosure, the record indicates that the trial court, while being fairly sympathetic to the State, seemed to attribute much of the delay to the State. For instance, the court agreed in April 2019 that defense counsel could not be expected to proceed to trial without assurances that the recently produced jail-call recordings would not be used—a concession the State refused to make at the time. In the hearings, the court made statements seeming to indicate some frustration with the State, such as, "This is the second hearing and it seems we have had something like this before," "This is the last time that I will do it," or, "I keep doing it. I keep doing it." The trial court could have concluded that a substantial portion of the delay between October 2018 and July 2019 was due to the State's late disclosure of evidence and weighted the first two *Barker* factors heavily in Brandley's favor. *See id.*

2. *Assertion of Speedy-Trial Rights*

As for Brandley's assertion of his right to a speedy trial, he did not file a motion for speedy trial and instead merely included a pro forma request for a speedy trial in his Waiver

of Arraignment, filed in April 2017.  *See State v. Munoz*, 991 S.W.2d 818, 826 (Tex. Crim. App. 1999) (defendant's "pro forma request for a trial date in the waiver of arraignment form cannot be considered an assertion of his right to a speedy trial under the circumstances of this case").  However, in addition to that pro forma request, his attorney announced ready for trial on October 30, 2018, April 23, 2019, and July 2, 2019, and she expressly invoked Brandley's right to a speedy trial in the April 2019 pretrial setting.  In July 2019, when the State again produced evidence shortly before the trial setting, counsel stated that she was going to file a motion to set aside the information on speedy-trial grounds.

Brandley never filed a written motion specifically demanding a speedy trial.  *See Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013) ("A speedy-trial demand should be, at the very least, unambiguous.").  However, counsel did unambiguously invoke Brandley's speedy-trial rights in the April 2019 pretrial setting only to have trial continued because of the State's late production of the jail-call recordings.  She then again received additional evidence just before the July 2019 setting.  The greater the State's "official negligence and the longer its actions delay a trial," the less a defendant must show actual prejudice or diligence in asserting his speedy-trial rights.  *See Cantu*, 253 S.W.3d at 280-81.  Thus, we weigh the third *Barker* factor as neutral or slightly against Brandley.

### 3.  *Prejudice*

Finally, we consider whether Brandley established prejudice.  The right to a speedy trial was designed to prevent oppressive pretrial incarceration, to minimize a defendant's anxiety and concern, and to limit the possibility that the defense will be impaired.  *Gonzales v. State*, 435 S.W.3d 801, 812 (Tex. Crim. App. 2014) (quoting *Barker*, 407 U.S. at 532).  Of those

16

interests, the last "is the most important because the fairness of the entire criminal-justice system is distorted when a defendant is unable to adequately prepare his defense." *Id*. The State asserts that we should determine "that there was no actual, particularized prejudice to [Brandley's] case" because of the delay, but "affirmative proof of particularized prejudice is not essential to every speedy trial claim, because 'excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.'" *Dragoo*, 96 S.W.3d at 315 (quoting *Doggett*, 505 U.S. at 655). This case lingered for forty-two months, and given the nature of the misdemeanor-assault charge, the trial court could reasonably have concluded that the delay was excessive enough to be presumptively prejudicial, *see Zamorano*, 84 S.W.3d at 648-49; *Davis*, 549 S.W.3d at 697,[5] requiring Brandley only to show "some prejudice," *see Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017) (proof of particularized prejudice is not always essential to speedy-trial claim); *see also Davis*, 549 S.W.3d at 697 (presumption that delay prejudiced defendant "intensifies over time").

Brandley was released on bail soon after his arrest in February 2016 and thus was not subjected to oppressive pretrial incarceration. However, he testified that he had been required to report weekly and then monthly to his bonding agent; that he had come to court "over 10, 12 times"; that he had been prepared to proceed to trial for the last three settings; that having to appear in court that often "impact[ed] [his] ability for maintaining full employment"; that

---

[5] *Compare Doggett v. United States*, 505 U.S. 647, 654-58 (1992) (delay of eight and one-half years was presumptively prejudicial), *and Guajardo v. State*, 999 S.W.2d 566, 570 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (delay of five years was presumptively prejudicial), *with State v. Wray*, No. 05-01-01799-CR, 2002 WL 1763567, at *4 (Tex. App.—Dallas July 31, 2002, pet. dism'd) (op., not designated for publication) (delay of twenty-five months was not presumptively prejudicial), *and Clarke v. State*, 928 S.W.2d 709, 717 (Tex. App.—Fort Worth 1996, pet. ref'd) (no presumptive prejudice where delay in retrial was twenty-nine months after Supreme Court denied certiorari and five months after appellant filed motion for speedy retrial).

several companies had said they would not hire him "until this case was over with" or until he was "done with [his] legal issues"; and that the lingering charge and its detrimental effect on his employability had caused him and his family hardship and stress. This testimony is sufficient to support a finding that Brandley had suffered at least a moderate level of anxiety and concern due to the pending charge. *See Zamorano*, 84 S.W.3d at 652-54 (defendant missed eleven days of work because of court dates, missed work for weekly reports to bonding company, and was worried every time he came to court; court of criminal appeals held that testimony, which was unchallenged by State, was "at least some evidence of the type of 'anxiety' that the Supreme Court considers under the prejudice prong of *Barker*").

In addition, Brandley testified that his ability to put on a defense had been harmed. One witness would have to testify from Florida via video call, which Brandley believed would reduce the witness's effectiveness. Another witness had been incarcerated and would have "to come testify from prison," and Brandley thought the jury would be less likely to believe the witness as a result. The State contends that Brandley did not show that either man was a material witness or that their testimony would be admissible, but although evidence of person's character or bad acts is generally not admissible to prove that the person acted in accordance with their bad character, such evidence may be admissible for purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See* Tex. R. Evid. 404. Further, in a criminal case, a defendant may offer evidence of "a victim's pertinent trait," subject to certain limitations not applicable here, *id.* R. 404(a)(2)(A), and a witness's credibility may be attacked by testimony about the witness's reputation for being untruthful or "by testimony in the form of an opinion about that character," *id*. R. 608(a). A defendant may also impeach a witness "with evidence of a previous false accusation against a

18

third party" if, "as a threshold evidentiary matter," he can "produce evidence showing the prior accusation is actually false." *Palmer v. State*, 222 S.W.3d 92, 95 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Brandley stated that the two witnesses would testify about the complainant, her violent tendencies, "how she can be," and that she and Brandley had stayed together after the alleged assault. Brandley's attorney asserted that she had learned about statements made by the complainant that were exculpatory to Brandley, as well as about other charges made by the complainant that were later dismissed by the State. The trial court could have determined that Brandley's two witnesses could have offered admissible evidence that would be material to his defense.[6] *See Balderas v. State*, 517 S.W.3d 756, 773 (Tex. Crim. App. 2016) (determining that prejudice prong "arguably weighs in favor of" defendant; noting that defendant had testified at speedy-trial hearing that brother committed suicide during delay but could have testified about alleged sexual abuse suffered by defendant; but declining to consider that asserted testimony because "when the trial court made its ruling, the sexual nature of abuse was not before it" and that "was not at issue before the trial court").

In granting the motion to set aside the information, the trial court impliedly found that Brandley had been prejudiced by the delay, and Brandley's testimony could support a finding of prejudice in the form of reduced employment opportunities, stress and anxiety, and impairment of his ability to put on an effective defense. *See Cantu*, 253 S.W.3d at 282 (we must

---

[6] The State further contends that Brandley cannot show he suffered prejudice related to those witnesses because he did not show either man was unavailable due to the delay, citing *George v. State*, 498 S.W.2d 202, 205 (Tex. Crim. App. 1973). Brandley, however, did not assert that the witnesses had become unavailable but rather that their testimony would be less effective due to changed circumstances, and we cannot hold as a matter of law that the trial court would have erred in agreeing that Brandley had shown some prejudice. *See* Tex. R. Evid. 609 (evidence of criminal conviction may be offered to attack witness's character for truthfulness if crime was felony or involved moral turpitude).

19

defer to trial court's resolution of disputed facts and to any reasonable inferences that can be drawn from facts, viewing evidence in light most favorable to court's decision). We next consider whether the State persuasively rebutted the presumption of prejudice or proved that Brandley acquiesced to the delay so as to vitiate his claim. *See Gonzales*, 435 S.W.3d at 815.

As noted above, although some of the delay early in the case can be attributed to Brandley, a significant portion of the delay, particularly after the case was set for trial in October 2018, was related to the State's repeated late production of possibly exculpatory evidence. And although Brandley's attorney signed several reset forms as "agreed," the record does not reflect the reason for the resets or whether Brandley's counsel sought the resets or merely signed the reset forms when informed by the trial court of a new setting. Further, Brandley appeared and announced ready several times, asking to go forward with the case and invoking his right to a speedy trial in April 2019, when the State turned over hours of recorded jail calls mere days before the trial setting despite Brandley's having been released on bond more than three years earlier. The record does not reflect that Brandley acquiesced in the delay such that the trial court was required to conclude that his conduct vitiated his showing of prejudice.

"[C]onsideration of prejudice is not limited to the specifically demonstrable," and given the length of delay in this case, the State's negligence is not "automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *Doggett*, 505 U.S. at 655-57; *see also Gonzales v. State*, No. PD-0724-12, 2013 WL 765575, at *1 (Tex. Crim. App. Feb. 27, 2013) (op., not designated for publication) (court of appeals "should have reviewed the record not for proof of prejudice but rather the rebuttal or extenuation of prejudice"). Further, Brandley presented some evidence of prejudice, and the State did not persuasively rebut his prima facie showing of prejudice. We overrule the State's issue on appeal.

20

## CONCLUSION

Having overruled the State's issue, we affirm the trial court's order granting Brandley's Motion to Set Aside the Information.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed

Filed:   August 6, 2021

Do Not Publish