# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-23-00496-CR

---

**The State of Texas, Appellant**

**v.**

**Aaron Andrew Uhl, Appellee**

---

**FROM THE 433RD DISTRICT COURT OF COMAL COUNTY**
**NO. CR2017-604, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING**

---

## O P I N I O N

Aaron Andrew Uhl was indicted for indecency with a child by sexual contact.
*See* Tex. Penal Code § 21.11(a)(1). The trial court granted Uhl's pretrial motion to set aside the
indictment for a violation of his right to a speedy trial. *See* U.S. Const. amend. VI.[1] On appeal,
the State contends in a single issue that the trial court erred by granting Uhl's motion and
dismissing the cause with prejudice. We reverse the trial court's order and remand the cause for
further proceedings consistent with this opinion.

---

[1] *See Leachman v. Stephens*, 581 F. App'x. 390, 402 (5th Cir. 2014) (noting that Sixth
Amendment right to speedy trial applies to states by incorporation under Due Process Clause of
Fourteenth Amendment).

## BACKGROUND[2]

The charge in this case arose from a 911 call in May 2017, in which fourteen-year-old Mark Williams[3] alleged that Uhl, a family friend, had drugged him and fondled his genitals while the two were on an overnight fishing trip. Responding deputies from the Comal County Sheriff's Office (CCSO) spoke with Williams, and audio of their conversation was recorded by the deputies' dash cameras. However, although the deputies uploaded the recordings, they were destroyed when a CCSO computer server crashed in October 2017 before prosecutors or defense counsel had reviewed them.

Uhl was arrested on June 5, 2017, and released on bond the next day. He was indicted for indecency with a child in August 2017.

Following his outcry, Williams underwent a toxicology screen,[4] and a sexual assault nurse examiner (SANE) collected swabs to test for the presence of foreign DNA. No testing was performed until November 2017, when Uhl filed a motion for DNA testing. Results were obtained only in March 2020, and no foreign DNA was detected. The State informed the trial court in a later hearing that it had not anticipated DNA transfer from an allegation of "mere

---

[2] These facts are drawn from the reporter's record and the trial court's order granting Uhl's motion. While the trial court did not make explicit findings of fact, its order contained two detailed "Factual Timeline" sections, which we construe as implied findings of fact and to which we will defer when they are supported by the record. *See Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008).

[3] Because the complainant was a minor at the time of the alleged offense, we will refer to him by a pseudonym in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

[4] The record does not include the results of the toxicology screen. While not evidence, defense counsel stated during the speedy-trial hearing that "[t]here was no blood work done on [Williams] regarding alcohol. There was a urine sample that reflected a very, very small amount of alcohol in his system."

touching," that the SANE had reported that Williams washed the touched area prior to swabbing, and that Williams's own DNA was not detected on one of the swabs.

As a result of the COVID-19 pandemic and Comal County's ensuing disaster declaration, criminal jury trials were suspended in the county from March 2020 until October 2021.[5] On their resumption, Uhl's trial was repeatedly delayed. It was originally set for July 2022, but defense counsel announced not ready at a hearing in June. The trial was reset for September 2022, but this time the State announced not ready at a hearing that month, explaining that several of its anticipated witnesses were unavailable. At a hearing in January 2023, both parties announced not ready. The following month, defense counsel moved for a continuance owing to a scheduling conflict with another trial, and the trial court granted the motion and set Uhl's trial for April 2023.

At a docket hearing on April 4th, the State notified the trial court that prosecutors had learned that week that in January 2023, Williams's father (Father) had committed suicide in front of Williams and Mother. The State moved for a continuance, which was denied by the court. The State filed a supplemental motion for a continuance on the ground that Williams and Mother needed time to arrange care for Williams's disabled brother, but that motion was also denied.

On April 10th, the date jury selection had been scheduled, defense counsel filed a motion to set aside the indictment for a violation of Uhl's speedy-trial right and argued during a pretrial hearing that there was a potential *Brady* issue concerning Father's suicide, which "develop[ed] the possibility of an alternative perpetrator." *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (requiring State to disclose on request material evidence favorable to defendant).

---

[5] In its order, the trial court noted that two civil jury trials were held during this period.

3

Counsel also argued that the State had violated article 39.14 of the Code of Criminal Procedure by failing to disclose the existence of the destroyed dash-cam videos until four days before trial. *See* Tex. Code Crim. Proc. art. 39.14(a) (requiring State, "as soon as practicable after receiving a timely request from the defendant," to permit inspection of certain discovery materials that are in its possession).

The State's belated disclosures and lack of diligence, counsel asserted, forced Uhl to choose between a speedy trial and thorough investigations into the circumstances of Father's suicide as well as whether the State had exercised bad faith in not preserving the dash-cam videos. *See Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988) (holding that State violates defendant's right to due process when, in bad faith, it fails to preserve potentially useful evidence). Uhl testified during the hearing about the prejudice he had suffered as a result of his trial's delay. The trial court dismissed the jury panel and instructed the parties to prepare proposed findings of fact and conclusions of law.

Trial was reset for July 31st, and a final pretrial hearing was held on July 13th, at which an attorney for Uhl advised the trial court that his wife was due to give birth on August 1st. Counsel stated that he "d[id] not want to move for a continuance" but "suggest[ed] a September date." The State announced ready and objected to resetting the trial date, but the trial court responded that "we just threw out the 31st date" and were "[j]ust trying to find a date to get it tried." The trial court asked whether the State had subpoenaed all of its witnesses, and the State answered, "If we don't have them served, we'll either get them served or go without them."

4

On July 24th, the trial court entered an order granting Uhl's motion to set aside the indictment and dismissed the cause with prejudice. This appeal followed. *See* Tex. Code Crim. Proc. art. 44.01(a)(1) (authorizing State to appeal order dismissing indictment).[6]

## DISCUSSION

To determine whether a defendant was denied the right to a speedy trial, we consider the four non-exhaustive factors listed by the United States Supreme Court in *Barker v. Wingo*: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay. 407 U.S. 514, 530 (1972); *see Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016). The third factor in particular is closely related to and shaped by the other factors and therefore is "entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Cantu v. State*, 253 S.W.3d 273, 283 (Tex. Crim. App. 2008); *see Barker*, 407 U.S. at 531–32 (stating that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial"). An appellate court must balance the factors "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Balderas*, 517 S.W.3d at 773 (quoting *Cantu*, 253 S.W.3d at 281). The State bears the burden of justifying the length of the delay, while the defendant has the burden of proving his assertion of the right to

---

[6] The Court of Criminal Appeals has held that when by setting aside an indictment a trial court effectively terminates a prosecution, the ruling constitutes a "dismissal" of an indictment under article 44.01(a)(1). *State v. Garrett*, 824 S.W.2d 181, 183 (Tex. Crim. App. 1992). Such dismissal is appealable as of the day the trial court signs the order. *State v. Wachtendorf*, 475 S.W.3d 895, 903 (Tex. Crim. App. 2015) (recognizing that its holdings plainly and consistently identify signing of order as event commencing timetable for filing State's notice of appeal); *Rodarte v. State*, 860 S.W.2d 108, 110 (Tex. Crim. App. 1993) (noting that State's timetable for notice of appeal begins on day that order dismissing indictment is signed).

5

a speedy trial and of showing prejudice. *State v. Davis*, 549 S.W.3d 688, 697 (Tex. App.—Austin 2017, no pet.) (citing *Cantu*, 253 S.W.3d at 280). The defendant's burden of proof on the third and fourth factors "'varies inversely' with the State's degree of culpability for the delay." *Cantu*, 253 S.W.3d at 280. Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* at 280–81.

We apply a bifurcated standard when reviewing a trial court's ruling on a speedy-trial claim: we review factual components for an abuse of discretion and legal components de novo. *Sample v. State*, 653 S.W.3d 287, 292 (Tex. App.—Austin 2022, pet. ref'd) (citing *Cantu*, 253 S.W.3d at 282). The balancing test as a whole is a purely legal question that we review de novo. *Id.* We review the trial court's ruling in light of the arguments, information, and evidence that was available to the trial court when it ruled. *Id.* (citing *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003)). We view the evidence in the light most favorable to the trial court's ruling and defer to both the trial court's resolution of disputed facts when supported by the record as well as the reasonable inferences drawn from those facts. *Cantu*, 253 S.W.3d at 282; *Sample*, 653 S.W.3d at 292.

In a single issue, the State contends that the trial court erred by granting Uhl's motion to set aside the indictment and by dismissing the prosecution with prejudice for a speedy-trial violation. The State argues that although the length of delay was presumptively prejudicial, the reasons for delay were equally attributable to both parties, Uhl was dilatory in asserting his speedy-trial right, and his defense was not prejudiced. Uhl responds that "the gravamen" of the trial court's ruling was "that the prosecution's delay in total was carried out in bad faith." He asserts that the State routinely failed to obtain subpoenas for its witnesses, that its

6

announcements of ready were therefore made in bad faith, and that it belatedly disclosed the destruction of the dash-cam videos and Father's suicide, thereby prejudicing Uhl by forcing him to elect between proceeding to trial or investigating the suicide and the merit of a potential *Youngblood* claim.

## I.      Length of Delay

In a pretrial appeal from an order dismissing a prosecution on speedy-trial grounds, the length of delay is measured from an accusation against a defendant—the earlier of the defendant's arrest or the presentment of an indictment or information against him—to the date of the hearing on the speedy-trial motion. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). *But see State v. Slack*, 629 S.W.3d 735, 739 (Tex. App.—San Antonio 2021, no pet.) ("We measure the length of delay from (1) the time the accused is arrested or charged to (2) the time of trial or the defendant's demand for a speedy trial."). This factor is to some extent a "triggering mechanism," *Shaw*, 117 S.W.3d at 889, which requires that a defendant make a "threshold showing that the interval between accusation and trial is 'presumptively prejudicial'" to necessitate that a court consider the remaining factors and weigh them, *Balderas*, 517 S.W.3d at 767. Presumptive prejudice is simply the burden to trigger a full inquiry; it "does not necessarily indicate a statistical probability of prejudice." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). Generally, delay approaching one year is sufficient. *Id.*; *cf. Cantu*, 253 S.W.3d at 281 ("[W]e have held that a delay of four months is not sufficient while a seventeen-month delay is."). However, even substantial delay does not mean that a defendant's speedy-trial right was violated; the factors have "no talismanic qualities," and no one factor alone is a "sufficient condition to the finding of a deprivation." *Barker*, 407 U.S. at 533. Courts have declined to find

speedy-trial violations in cases involving delay of over five years. *See id.* at 534 ("well over five years"); *Balderas*, 517 S.W.3d at 768 ("more than eight years"); *Laird v. State*, 691 S.W.3d 30, 38 (Tex. App.—Austin 2023, pet. ref'd) ("approximately five-and-a-half years").

Uhl was arrested in June 2017, and the hearing on his motion to set aside the indictment was held in April 2023. The State concedes that the length of this delay—almost six years—is presumptively prejudicial and necessitates consideration of the remaining factors. This factor weighs heavily against the State. *See Barker*, 407 U.S. at 533 (describing delay of "well over five years" as "extraordinary"); *Balderas*, 517 S.W.3d at 768 (stating that delay of "more than eight years" was "sufficient to trigger the *Barker* inquiry" and that because delay "stretched far beyond the minimum needed to trigger the inquiry," factor weighed heavily in favor of finding violation of speedy-trial right).

## II. Reason for Delay

The Supreme Court in *Barker* listed three categories of delay that a reviewing court must weigh when conducting a speedy-trial analysis and explained the weight that should be given to each category. *See id.* at 531. First, a deliberate attempt to "hamper the defense" weighs heavily against the State. *Id.*; *Balderas*, 517 S.W.3d at 768. Second, neutral reasons, "such as negligence or overcrowded courts," weigh less heavily but must still be considered "since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531. Finally, valid reasons, such as a missing witness, "should serve to justify appropriate delay," *id.*, and do not count toward the length of delay, *Gonzales v. State*, 435 S.W.3d 801, 810 (Tex. Crim. App. 2014). Additionally, delay caused by the defendant or his counsel weighs against the defendant. *Hopper v. State*,

8

520 S.W.3d 915, 924 (Tex. Crim. App. 2017) (citing *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)); *Balderas*, 517 S.W.3d at 768. If the record does not provide a reason for a delay, a court may not presume that the delay was due to a "valid reason" or to the State's bad faith. *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003).

As characterized by the trial court, the delay in this case is broadly divisible into four discrete periods for which we may attribute responsibility between the parties: (1) the State's initial investigation, (2) DNA testing, (3) the COVID-19 pandemic, and (4) post-pandemic delay.[7] We consider each in turn.

A.      Investigation

The trial court correctly concluded that the seven months from Uhl's arrest to the State's first ready announcement in January 2018 did not count against the State because it was "entitled to a reasonable period in which to prepare its case." *Shaw*, 117 S.W.3d at 889–90; *see Roque v. State*, 693 S.W.3d 771, 776–77 (Tex. App.—Houston [14th Dist.] 2024, no pet.) (collecting witnesses is valid reason for delay that does not weigh against State).

---

[7] Our understanding of the full scope of the delay is incomplete. At the hearing on April 4, 2023, the trial court acknowledged that the case had at that time been reset thirty-three times. Although the State's brief in reply to Uhl's speedy-trial motion asserts that "25 of them were agreed resets, encompassing the vast majority of time this case has been pending" and that "five were cancelled by the court's own motion," the only resets evidenced in the record before us are those discussed in the opinion.

**B.      DNA Testing**

Shortly after Williams reported the alleged offense to police in May 2017, a SANE swabbed him to test for the presence of foreign DNA.[8]  The State represented to the trial court during a pretrial hearing that the SANE had noted in her report that Williams washed the area allegedly touched by Uhl prior to the swabbing.

In November 2017, around six months after the swabs were collected, defense counsel filed a motion for DNA testing, and the State agreed to test the swabs.  The State informed the trial court and defense counsel during a hearing in April 2018 that results would "take a while" because the "lab is backed up" and was still testing materials submitted in 2016.  During the hearing, the State also informed the trial court that it did not believe the DNA results would be material, that the absence of exculpatory results would not "conclusive," and that it was "prepared to go forward" without waiting for the results.

Results were obtained in March 2020, around two-and-a-half years after counsel filed the motion for DNA testing.  The State informed the trial court that "there was no foreign DNA detected" and that the lab "didn't even detect the victim's own DNA off of one of the swabs."

In its order, the trial court weighed the delay for DNA testing against the State[9] and expressed a belief that the State is constitutionally required to test all "potential DNA

---

[8]  The record before us does not specify from where the swabs were taken or how many swabs were collected.

[9]  To the extent that it may be intended as a finding of fact, we will not defer to the trial court's assertion in its order that "the State accedes the government's responsibility behind the delay—the need to test un-tested biological swabs."  The record does not support a finding that the State accepted responsibility for the delay occasioned by the testing.  Indeed, the State's filings in the trial court and on appeal contest its responsibility.

10

evidence" in its possession—at least in "every case of a sexual nature," for which the court determined that "[p]ossible outcomes from DNA testing . . . have significant impacts."

The trial court condemned the State's decision not to test the swabs, declaring that the prosecution, "at a minimum, bears the initial responsibility to obtain access to the most basic of relevant scientific results, *i.e., presumptive DNA test.*" Characterizing the swabs as "potentially Michael Morton-freeing type evidence," the court explained that in light of the State's decision to proceed to trial without testing the swabs, it would be "incongruous, if not illogical" to weigh the delay for their testing against Uhl. The trial court summarized its reasoning during the hearing on the speedy-trial motion:

> [The State] can make [its] decision if [it] wants to go to trial on a sex type of case without doing DNA testing on biological matters that [it has] got in [its] possession or not. But then once somebody joins issue, so to speak, post indictment, those kind of things ought to be done without anybody needing to ask. Because the failure to – in my view, my humble opinion, once the issue is joined and you've got biological matter in your possession, it better be tested. And so I do ascribe the delay in that regard on the State.

We have not found, nor has the trial court or Uhl provided, any legal authority supporting the proposition that the State is required to test all potential DNA evidence in its possession or that any delay resulting from such testing be weighed against the State in a speedy-trial analysis.[10] To the contrary, "the state is not required to seek out exculpatory evidence independently on appellant's behalf, or furnish appellant with exculpatory or mitigating evidence that is fully accessible to appellant from other sources." *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006). *Brady* and its progeny did not "displace the adversary system as

---

[10] We do not speak to whether the State *should* test DNA evidence in its possession—in pursuit of justice, equity, or self-interest—only whether the United States Constitution compels testing, such that delay in doing so should accrue to the State for speedy-trial purposes.

the primary means by which truth is uncovered," *United States v. Bagley*, 473 U.S. 667, 675 (1985), did not create a "general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), and do not "require searches for exculpatory material . . . even if the prosecution has access to the information on which the defendant wants the particular searches performed," *Diez v. State*, 693 S.W.3d 899, 922 (Tex. App.—Austin 2024, pet. ref'd).

The burden of conviction is on the State, and it is the State alone that is responsible for deciding how to prosecute its case. To assign delay resulting from DNA testing requested by the defense to the State would effectively permit a defendant to create a speedy-trial violation by moving to test all available DNA evidence in a sexual-misconduct case and place the inevitable delay at the State's feet.

Rather, the typical delay attendant on DNA testing weighs not against the State but against Uhl himself. *See Balderas*, 517 S.W.3d at 768 ("Delay caused by either the defendant or his counsel weighs against the defendant."); *cf. Roque*, 693 S.W.3d at 777 (concluding that period of delay attributable to defense's requests for DNA testing and retesting "cannot be weighed against the State in a speedy-trial analysis"). This is not to say that the State cannot bear responsibility for speedy-trial purposes for delay resulting from DNA testing requested by a defendant. When, as here, some of the delay is caused by a testing backlog in the lab, the delay will weigh against the State but not heavily. *See State v. Davis*, 549 S.W.3d 688, 703 (Tex. App.—Austin 2017, no pet.). However, there is no evidence in the record as to how much of the delay in this case resulted from the backlog, and we need not precisely apportion the period of delay between the parties. It is enough to conclude that Uhl and the State shared

12

responsibility for the delay. Although Uhl argues that the Court's decision in *State v. Davis* mandates assigning the State responsibility for the entire delay, he is mistaken. *See id.*

In *Davis*, which involved a retrial, the defendant initially moved for DNA testing, the State subsequently asked for a continuance to complete the testing, and the trial court issued multiple orders *sua sponte* greatly expanding the testing's scope. *Id.* at 701–03. The trial court refused to find that the State had resisted testing and concluded that it had not deliberately attempted to delay the trial. *Id.* at 702–03. This Court reasoned that the trial court's crowded docket and delay by the DNA lab weighed against the State but not heavily and that the State's motion for continuance was "balanced out" by the defendant's having initiated the testing, the benefit of DNA testing, and the trial court's decision to have "everything" tested. *Id.* at 703. Under those circumstances, the Court concluded that "the reason-for-delay factor d[id] not weigh against the State under any time frame of the case." *Id.* at 703–04.

Here, by contrast, although the State agreed to test the swabs, the testing was initiated by Uhl and opposed from the outset by the State, which did not request additional time for testing. During the speedy-trial hearing, the State's attorney made known the State's reasons for not pursuing DNA testing, explaining that his "experience with DNA is that you aren't going to typically get DNA results on a[n allegation of] mere touching"; that the SANE reported that Williams had washed the swabbed area before the swabs were collected; and that while it was "possible that DNA survived a cleaning of the area touched, . . . we're talking astronomical probabilities here." The State emphasized that although no foreign DNA was detected, neither was "the victim's own DNA off of one of the swabs." The need for testing was endorsed by the trial court against the State's protestations. And, as in *Davis*, a backlog in the lab contributed to

the delay. Because the State was less responsible for the testing in this case than in *Davis*, the reason-for-delay factor weighs still less on its shoulders.

Thus, we conclude that this period of delay weighs slightly against Uhl. *See Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017) ("Delay caused by the defense weighs against the defendant." (citing *Brillon*, 556 U.S. at 90)); *Balderas*, 517 S.W.3d at 768.

C.       **COVID-19 Pandemic**

In response to the COVID-19 pandemic, jury trials in Comal County criminal courts were suspended from March 2020 to October 2021. Although the trial court indicated in its order that a trial could have been conducted and referenced two civil trials that were apparently held after an application, planning, and approval process, those facts are not in evidence in the record before us, and we will not consider them in our analysis. There is nothing in the record to suggest that the process was available for criminal trials, that either party was ready for trial at that time, or that Uhl expressed interest in applying for a trial.

Nevertheless, despite finding that a trial could have been held and positing that the "burden" of "attempting to avoid a virus . . . rests with the prosecution," the trial court concluded that the delay caused by the government shutdown weighed against the State only slightly, and we agree. *See Laird*, 691 S.W.3d at 40 (stating that "[t]o the extent that the pandemic and related court closures weigh against the State, they do so but slightly"); *cf. State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.) ("Delay caused by the onset of a pandemic cannot be attributed as fault to the State.").

14

### D.    Post-Pandemic Delay

After criminal jury trials resumed in Comal County, crowded dockets and administrative delays meant that nine months elapsed before Uhl's case was set for trial. This period counts against the State but not heavily. *See Shaw*, 117 S.W.3d at 890 ("[A] crowded court docket is not a valid reason for delay and must be counted against the State, although not heavily.").

The first post-pandemic hearing reflected in the record occurred on June 28, 2022, at which the defense announced not ready, and the State announced ready. The trial court reset the case to accommodate the defense. The delay between this hearing and the next, on September 6, 2022, therefore weighs against Uhl.[11] *See Hopper*, 520 S.W.3d at 924; *Balderas*, 517 S.W.3d at 768; *Shaw*, 117 S.W.3d at 889.

At the September 2022 hearing, defense counsel announced ready, and the State announced not ready, explaining that it had "one witness out on maternity leave, one in training, and about four or five that aren't served at the moment." The trial court granted a continuance in response to the State's announcement and correctly noted in its order that delay owing to the State's missing witnesses did not weigh against it. *See Barker*, 407 U.S. at 531 (describing missing witness as "a valid reason" that "should serve to justify appropriate delay").

The next hearing was held in January 2023, at which both parties announced not ready, and the case was reset to February. Delay arising from this agreed reset is excluded from our analysis. *Richardson v. State*, 631 S.W.3d 269, 275 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (excluding from calculation "the time covered by the agreed resets").

---

[11]   Both the State's brief and the trial court's order reference a hearing on July 5, 2022. No evidence of that hearing is in the record before us.

Defense counsel moved for a continuance during the February hearing because he was in trial in Bexar County. Although the trial court granted the motion and references the continuance in the fact section of its order, the court did not mention the motion or resulting delay in its analysis section. The continuance weighs against Uhl. *See Hopper*, 520 S.W.3d at 924; *Shaw*, 117 S.W.3d at 889.

During the next hearing, on April 4, 2023, the defense announced ready, and the State announced not ready on the basis that it had learned that week of Father's January suicide. The State moved for a continuance, which was denied by the trial court. In a supplemental motion for continuance, which the court also denied, the State explained that Williams and Mother needed time to arrange for Williams's disabled brother's care.

Defense counsel filed a motion to set aside the indictment on April 10th, and a hearing was held on the motion the same day. At the hearing, the State announced ready. The trial court ordered the parties to prepare proposed findings of fact and conclusions of law and file any necessary supplemental briefing.

In June 2023, the trial court reset the trial for July 31st. A final hearing was held on July 13th, at which the State announced ready. Although defense counsel stated that he did not want to move for a continuance, he informed the court that his wife was due to give birth on August 1st and requested that trial be postponed until September. The State objected, but the trial court questioned "what good the ruling on the objection does" and suggested that "we just threw out the 31st date" and were "[j]ust trying to find a date to get it tried, it's just like throwing a dart." However, the court declined to reset the case and asked that the parties update the court as needed. The court granted Uhl's motion to set aside the indictment on July 24, 2023, and ordered that the prosecution be dismissed with prejudice.

16

### E.      Bad Faith and Readiness

Uhl argues on appeal that rather than focusing on the causes of discrete periods of delay, *Barker* requires that we instead focus on their "net effect" in light of "the gravamen of the [trial court's] decision—that the prosecution's delay in total was carried out in bad faith." Uhl also argues that the delay in bringing his case to trial was "wholly attributable to the [State's] inaction" and asserts that the trial court's "most important factual determination" was that the State was announcing ready in bad faith. He concludes that

> the specific weight the [trial court] attributes to each of these periods is simply a step in the analysis; the bad faith of the prosecution overall shifts the analysis in a manner that is distinguishable from every decision relied upon by [the State] and that profoundly justifies the court's ruling irrespective of whether the individual weight of any period of delay or other *Barker* factor deviates from the ordinary case.

In its order, the trial court drew two conclusions regarding the State's conduct in prosecuting the case: the State failed to exercise "due diligence" and announced ready in bad faith at the July 13, 2023 hearing.[12] The court listed as evidence of the State's lack of diligence its

> proceeding to grand jury without watching and preserving a copy of the Watchguard videos, proceeding forward without ascertaining whether swabs contained any DNA or other biological material, announcing ready for trial without contacting key witnesses including the lead detective or complainant, and not timely informing the defense of potential exculpatory evidence including confirmation of the destruction of evidence.

---

[12] The trial court's reference to a hearing in June 2023 appears to be mistaken.

17

The trial court concluded that the State's conduct was not intended "to target [Uhl] specifically for relying on his legal rights" but admonished that "the record does reveal that a zealous defense is often countered with questionable obfuscation."

With respect to the State's readiness for trial in July 2023, the trial court stated that although the State announced ready, "the record reveals, at best, that the prosecution appears to be gaming the system" because it had not subpoenaed Williams, and the State's attorney did not know "whether the State (attorneys, investigators or victim/witness coordinators) had made any recent contact with the complainant, his mother or the family—at all." Because the State had not served Williams or Mother with the subpoenas issued and delivered to the State's investigator weeks earlier, the court concluded, its announcement of ready "appears rather gratuitous and disingenuous" and "to be in bad faith."

Ultimately, the trial court ruled that from "the State's reasons for delay, its dubious announcements of ready and its inaction to prepare for an upcoming trial even while this motion has remained pending, [the c]ourt concludes that the reasons for the entirety of the delay weigh heavily against the State."

First, we reject the approach advocated by Uhl, namely, consideration of the entirety of the delay as a single period, for which responsibility should weigh against one party or the other. This approach is not consistent with *Barker*, in which the Supreme Court instructed that "different weights should be assigned to different reasons" for delay. *Barker*, 407 U.S. at 531. Rather, the reason-for-delay factor is a "fact-specific inquir[y]," *Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013), and the "particular reason for the delay will determine how heavily this factor should weigh against the State," *State v. Wei*, 447 S.W.3d 549, 554 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).

18

Second, Uhl overstates the trial court's bad-faith finding. The court did not find that the State acted in bad faith throughout the duration of the delay but only that its ready announcement on July 13, 2023—two weeks before the speedy-trial motion was granted—was made in bad faith.[13] Rather than bad faith, much of the criticism levied by the court against the State amounts to a finding that the State was negligent in preparing its case or apprising the court or defense of developments. The court characterized many of the State's shortcomings as a lack of diligence and expressly found that it had not targeted Uhl for asserting his rights.

Third, the State's conduct in question did not delay trial and therefore should not weigh against the State in a reason-for-delay analysis. If the State announced ready before it had ensured the appearance of its witnesses at trial or gathered all available inculpatory evidence, then its premature announcement not only did not prevent a trial from being held; it benefitted Uhl. In an analogous situation, in which the Court of Criminals Appeals held that a trial court lacked authority to dismiss a prosecution after the State's attorney failed to appear for trial, the Court explained in dicta that if the State had previously announced ready, the trial court's options were simple: "the trial court could call the case to trial and, absent evidence or witnesses by the State, find the defendant not guilty. If a prosecutor appears and witnesses are not available, then the trial court could simply deny the State's motion for continuance." *State v. Johnson*, 821 S.W.2d 609, 614 n.8 (Tex. Crim. App. 1991). If the trial court here felt that the State, despite announcing ready, had not prepared as strong a case as it could have, the court should not have weighed the time necessary to prepare a stronger case against the State but merely held it to

---

[13] In a footnote, which we do not understand to be an implicit finding by the trial court, it insinuated that the State's "prosecutorial methods employed to effectuate discretionary decisions"—which the court termed "mishaps"—are so frequent as to "lend[ themselves] to the conclusion of bad faith as well."

19

its burden. *Cf. Hopper*, 520 S.W.3d at 928 ("[A] finding of bad faith in the speedy trial context requires a showing that the State was trying to gain a tactical advantage in the defendant's case.").

The State's yearslong delay in disclosing the inadvertent destruction of the dash-cam videos likewise did not delay trial; indeed, the parties were unaware of the videos' loss until three months before the trial court dismissed the prosecution. Earlier disclosure may, as Uhl argues, have allowed him to investigate whether the State took appropriate steps to preserve the videos, but it would not have caused a trial to have been held sooner. No matter what avenues of relief became available to Uhl on learning in April 2023 of the videos' destruction, a quicker trial was not one of them. *See Barker*, 407 U.S. at 531; *see also Cantu*, 253 S.W.3d at 281 ("The constitutional right is that of a speedy trial, not dismissal of the charges."). And although Uhl asserts that following the dilatory disclosure, he is now forced to elect between trial and a more thorough investigation of the State's preservation measures, any delay resulting from such an investigation is outside the scope of the delay under consideration in this case. *See Munoz*, 991 S.W.2d at 822.

Neither is our analysis changed by the trial court's finding that the State was not diligent in failing to discover and disclose Father's suicide until April 2023, three months after it occurred. In January 2023, a hearing was held at which both parties announced not ready. The following month, defense counsel was in trial in Bexar County and moved for a continuance, and the trial court noted in its order that the "next available trial setting was April 2023," when the State disclosed the suicide. Thus, had Father's death been disclosed in January, the resets until April—when our analysis ends—would have been agreed and therefore excluded from our calculation. *See Richardson*, 631 S.W.3d at 275.

20

F.     **Summary**

Of the approximately six-year delay between Uhl's arrest and the hearing on his speedy-trial motion, around two-and-a-half years of delay were attributable to each of the parties, and a little over a year of delay was attributable to neither. We apportion slight weight against the State for the delay of two years and four months caused by the pandemic and resulting administrative delay in processing the courts' case backlog. *See Shaw*, 117 S.W.3d at 890; *Laird*, 691 S.W.3d at 40. Against Uhl we weigh much of the delay of two years and four months owing to DNA testing initiated on his motion. *Hopper*, 520 S.W.3d at 924; *Balderas*, 517 S.W.3d at 768; *cf. Davis*, 549 S.W.3d at 701–04; *Roque*, 693 S.W.3d at 777. However, the State must also bear some responsibility for whatever delay was occasioned by the lab's testing backlog, the precise duration of which is unclear from the record. *Davis*, 549 S.W.3d at 703–04. We also weigh against Uhl the two-month delay from the defense's announcement of not ready at the first post-pandemic hearing in June 2022 as well as the two-month delay following defense counsel's motion for continuance during the February 2023 hearing. *Balderas*, 517 S.W.3d at 768. Against neither party do we weigh the State's initial seven-month investigation, *Shaw*, 117 S.W.3d at 889–90; the four-month delay caused by the State's missing witnesses at the second post-pandemic hearing, *Barker*, 407 U.S. at 531; and the three-month delay after the third pandemic hearing at which both sides announced not ready, *Richardson*, 631 S.W.3d at 275. As noted, we do not consider delay which occurred after the hearing on Uhl's speedy trial motion on April 10, 2023. *See Munoz*, 991 S.W.2d at 822.

Applying the appropriate weights to the various reasons for delay, we conclude that this factor weighs slightly against Uhl. *See Barker*, 407 U.S. at 531; *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002).

### III. Assertion of the Right

The defendant's assertion of his right to a speedy trial is entitled to strong evidentiary weight in determining whether that right has been denied. *See Balderas*, 517 S.W.3d at 771 (citing *Gonzales*, 435 S.W.3d at 810–11); *Davis*, 549 S.W.3d at 704. A speedy-trial demand should be unambiguous. *Henson*, 407 S.W.3d at 769. When a defendant does not timely demand a speedy trial, it "indicates strongly that he did not really want one." *Balderas*, 517 S.W.3d at 771 (citing *Dragoo*, 96 S.W.3d at 314–15) (finding three-and-a-half-year delay in which defendant "quietly acquiesced" weighed "very heavily" against finding speedy-trial violation); *see Davis*, 549 S.W.3d at 704 (concluding that assertion-of-right factor weighed heavily against defendant who "acquiesced to the delay from the prolonged wait for results of DNA testing that he initiated"). Repeated requests for a speedy trial weigh heavily in favor of a defendant, "while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only a dismissal." *Cantu*, 253 S.W.3d at 283. Moreover, although filing for dismissal of the charges instead of a speedy trial does not necessarily waive a speedy-trial claim, *see Davis*, 549 S.W.3d at 704, doing so "will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one," *Cantu*, 253 S.W.3d at 283 (citing *Zamorano*, 84 S.W.3d at 651 n.40); *see Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim. App. 1983) (noting that "[i]n some cases, defense counsel may legitimately feel that a long delay has caused a client so much prejudice that dismissal is warranted, even if the State is belatedly ready to move promptly"). Where a defendant seeks dismissal before seeking a speedy trial, he "should provide cogent reasons" for doing so. *Cantu*, 253 S.W.3d at 283. Lastly, while a lengthy delay reduces defendants' burden to show prejudice, it "increases their burden to show that they timely asserted the right." *Sample*, 653 S.W.3d at 291.

22

Both Uhl and the State agree with the trial court's finding that Uhl first asserted his right to a speedy trial in his motion to dismiss, which was filed on April 10, 2023—almost six years after his arrest in June 2017. The record reflects that the case was reset dozens of times but includes nothing to indicate that Uhl objected to the resets. He requested continuances in April 2018, June 2022, and February 2023; agreed to a reset in January 2023; and did not object to the State's request for a continuance in September 2022. Further, Uhl initiated DNA testing that resulted in an almost two-and-a-half-year delay. *See Davis*, 549 S.W.3d at 704. On the very day that he filed his motion, a jury panel was present in the court but was excused to give the trial court time to consider the motion.

Despite the trial court's determination that Uhl's "effort in asserting his right . . . does weigh heavily against" him, the court found that defense counsel's ready announcement in September 2022 "constitutes a successful assertion of the right—albeit one that is somewhat ambiguous." That finding is contrary to the Court of Criminal Appeals' holding in *Henson* that a defendant's assertion of the right to a speedy trial "should be, at the very least, unambiguous" and that "announcing ready . . . is not a *demand* for a speedy trial" but "merely asserts that [the defendant] could go to trial at that moment should the State push for it." 407 S.W.3d at 769; *see Barker*, 407 U.S. at 517–19 (no assertion of speedy-trial right when defendant filed motion to dismiss indictment in response to "another motion for continuance" by prosecution); *Munoz*, 991 S.W.2d at 825–26 (request for trial date in pro se waiver of arraignment and motion to sever asking for jury trial could not be considered assertions of speedy-trial right).

Uhl does not dispute that "the absence of an affirmative demand for a speedy trial weighs against him" but argues that he "should not be penalized for failing to realize the bad

23

faith of the prosecution at an earlier stage of the proceedings"[14] and that his request for dismissal instead of a trial was proper in light of the prejudice he had already suffered from the delay. Prejudice is a distinct factor under *Barker* and is addressed below. Uhl asserts that the Supreme Court recognized that dismissal is the proper remedy under similar circumstances in *United States v. Strunk*, 412 U.S. 434 (1973).

*Strunk*, however, did not involve an analysis under *Barker*'s assertion-of-right factor and is distinguishable from the present case. The Seventh Circuit Court of Appeals determined that Strunk had been denied his right to a speedy trial and held that the proper remedy was reduction of his sentence, which the Court of Appeals concluded was illegal. *Id.* at 435. The Supreme Court suggested that there may in fact have been no speedy-trial violation but limited its review to the propriety of the Seventh Circuit's remedy and held that "[i]n light of the policies which underlie the right to a speedy trial, dismissal must remain, as *Barker* noted, 'the only possible remedy.'" *Id.* at 436–37, 440 (citing *Barker*, 407 U.S. at 522). By contrast, the State's appeal in this case concerns whether Uhl was denied a speedy trial, not whether the trial court, having concluded that he was, erred by dismissing the prosecution.

Because Uhl repeatedly requested or assented to resets and continuances in the case, initiated a lengthy process of DNA testing, waited almost six years to assert only once his speedy-trial right, and in doing so asked for dismissal of his prosecution instead of a trial, we conclude that there is substantial evidence that he had no interest in a trial and that this factor weighs very heavily against him. *See Barker*, 407 U.S. at 522 (distinguishing cases "where the defendant has failed to object to continuances" and declaring that "we would be reluctant indeed

---

[14] As discussed above, the trial court found that the State acted in bad faith only by announcing ready at the hearing in July 2023, *after* Uhl had asserted his right to a speedy trial.

24

to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial"); *Dragoo*, 96 S.W.3d at 315 (noting three-and-half year delay in which defendant "quietly acquiesced" and concluding factor weighed "very heavily against finding a violation of the speedy trial right"); *Davis*, 549 S.W.3d at 708 (considering delay caused by DNA testing initiated by defendant in weighing factor); *Ragsdale v. State*, --- S.W.3d ---, ---, No. 01-23-00250-CR, 2025 WL 1073421, at *9 (Tex. App.—Houston [1st Dist.] Apr. 10, 2025, no pet. h.) (concluding that defendant's speedy-trial claim was "significantly weaken[ed]" where he waited "4.5 years to request dismissal"). The lengthy delay in this case increased Uhl's "burden to show that [h]e timely asserted the right," and the record demonstrates that he made a "knowing choice not to object to the failure to set a trial date." *See Sample*, 653 S.W.3d at 291; *see also Dragoo*, 96 S.W.3d at 314 (inaction weighs more heavily against violation as delay lengthens).

## IV.    Prejudice

The same length of delay that heightens Uhl's burden to show that he timely asserted his right lessens his burden to show prejudice. *Id.* The United States Supreme Court has identified three interests of the defendant that the speedy-trial right was meant to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532; *Laird*, 691 S.W.3d at 42–43. The most serious is the last, including the unavailability of witnesses or loss of memory, because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. A defendant "has the burden to make some showing of prejudice, but a showing of actual prejudice is not required." *Balderas*,

25

517 S.W.3d at 772. "Evidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation." *Sample*, 653 S.W.3d at 292 (citing *Cantu*, 253 S.W.3d at 286).

Although "[i]n cases with excessively lengthy delays to which the defendant does not acquiesce, an inference of actual prejudice may arise," such an inference does not arise here because Uhl caused or acquiesced to much of the delay. *See Davis*, 549 S.W.3d at 708. Indeed, "[d]elay is not an uncommon defense tactic" and "may work to the accused's advantage." *Barker*, 407 U.S. at 521. As the *Barker* Court explained: "As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof." *Id.*; *see Rivera v. State*, 990 S.W.2d 882, 892 (Tex. App.—Austin 1999, pet. ref'd) ("Time can damage either side's case, and it is often impossible to determine which side has been prejudiced more severely.").

Uhl argues that we should consider not only the harm that was caused by the delay in this case but suggests that we should also attempt to predict "the harm that continued delay caused by the prosecution's use of untimely discovery as a delay tactic *would* have caused." He provides no authority requiring us to engage in such a speculative inquiry of potential future prejudice beyond the period of delay contemplated by *Barker*, and we will not do so.

Uhl also argues, without elaboration, that the State's delay in disclosing the dash-cam videos' destruction prevented him from "effectively" investigating whether the State's

preservation measures were sufficient under *Youngblood*.[15]  *See* 488 U.S. at 58.  Yet our inquiry is not whether Uhl was prejudiced by the dilatory disclosure but whether he was prejudiced by the delay of a *trial*.  *See Barker*, 407 U.S. at 515–16.  The defense did not even learn of the videos' destruction until approximately a week before moving to dismiss the prosecution on speedy-trial grounds, and there is nothing in the record to suggest that the videos or their absence were responsible for any of the delay prior to April 2023.  While the trial court criticized the State's failure to disclose the loss of the evidence in a timely manner, it was silent about the defense's apparent failure to attempt to view the videos—which were referenced in offense reports provided to the defense in September 2017[16] and which the court described as "the best evidence of [Williams's] initial statements"—in the nearly six years before Uhl filed his motion.

Additionally, the record offers little reason to believe that the destroyed videos, if they still existed, had exculpatory evidentiary value.  Uhl proposes that they would have allowed jurors to observe Williams's demeanor and determine whether he appeared intoxicated, thereby potentially undermining his allegation that he was drugged.  Uhl also suggests that the videos could have been used to impeach Williams at trial if his testimony were to contradict his recorded statements.

The videos' exculpatory value was therefore exceedingly contingent and speculative.  It is also contradicted elsewhere in the record.  One of the responding deputies,

---

[15]  We note that although the trial court faulted the State for not securing and providing the dash-cam videos to the defense before Uhl's August 2017 indictment, it found that the videos were uploaded to the CCSO system by deputies in May 2017 and that their destruction, which occurred around five months later, was the inadvertent result of a server crash.

[16]  The trial court remarked that the record includes discovery logs "purportedly provided [to] the defense" and "documented in the record to include offense reports that reference the existence of the deputies' videos."  However, the court questioned "the full extent of what discovery was, in fact, available to the defense at any particular point in time."

27

Adam McCosh, testified during the speedy-trial hearing that he and his fellow deputy, Paul Seibel, had a conversation with Williams inside a residence after responding but that no part of the interaction was captured by deputies' dash cameras and that the conversation was "audio only." McCosh testified that he remembered Williams seeming "pretty fearful" during the initial interaction but that he remembered nothing else in particular regarding Williams's "demeanor and state of mind." The trial court found in its order that there was "no reason to question the veracity or credibility of the testimony provided." In Seibel's offense report, he noted that during the "initial field interview to determine what was going on, . . . [he] did not go into specifics with [Williams]." Moreover, although the record includes statements from Williams that Uhl gave him two or three drinks, after which Williams felt intoxicated, the drinks were allegedly provided around 10:30 p.m., and Williams did not call 911 until around 5 a.m., almost seven hours later. Thus, it is questionable to what extent he would still have appeared intoxicated had he been provided alcohol by Uhl.

As well as prejudice resulting from the State's delay in disclosing the dash-cam videos' destruction, Uhl argues that he was prejudiced by the State's three-month delay in disclosing Father's suicide. This argument is without merit for the same reasons discussed above in relation to the videos and because the suicide occurred approximately five-and-a-half years into the period of delay, a relatively minimal amount of time elapsed between the suicide and the State's disclosure, and the probative value of the suicide is even less than that of the videos. As the trial court repeatedly recognized during the speedy-trial hearing, there was no evidence that Father sexually abused Williams, and the nexus between the suicide and the charged offense was "being generated from thin air here by the defense." In considering prejudice during the speedy-

28

trial motion, the court stated that it had not "even talked about [the suicide]" and that the suicide was "not the issue" and "the least of [the court's] concerns."

The remainder of the prejudice alleged by Uhl—whose pretrial confinement consisted of one night in jail—involves the financial, reputational, and personal consequences of having been charged with a child-sexual offense. He testified during the speedy-trial hearing that "he was basically forced out" of his job as a firefighter "as a result of [his] indictment"; that he has been unable to find a new job because of the pending charge; that he had largely exhausted his finances and was relying on the help of a friend; and that "when this indictment came down," he and his ex-wife agreed to modify their child-custody arrangement, and he can no longer see his children "solely because [he was] under indictment in this case." *See Voda v. State*, 545 S.W.3d 734, 744 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Appellant's self-serving testimony alone is insufficient to demonstrate prejudice."). Importantly, Uhl does not allege that the delay has caused witnesses to become unavailable or evidence to be lost; rather, he asserts vaguely that "[t]he testimony at trial also demonstrated that memories of the situation were faded."[17] Although Uhl argues that the depletion of his financial resources would have left him unable to investigate the State's belated disclosures, the trial court did not even mention Father's suicide specifically when analyzing prejudice and, regarding the destroyed videos, conceded that "[a]t this point in time, everyone is at a loss to be able to determine what value the audiovisual material may have had." Moreover, we will not estimate hypothetical harm that might have occurred from further delay had the case not been dismissed. Regarding

---

[17] Presumably, Uhl means the speedy-trial hearing. He does not provide any examples other than stating that the lead investigator "had not thought about or worked the case since 2017," which does not demonstrate a loss of evidence due to worsening memory. *See State v. Munoz*, 991 S.W.2d 818, 829 (Tex. Crim. App. 1999) (agreeing that bare assertion of dimming memories does not constitute some showing of impairment to defense).

29

anxiety and concern, Uhl states in his brief only that he has been deprived of emotional support and has suffered extreme psychological harm. There is no evidence of psychological harm in the record, however, and it was not among the many forms of prejudice testified to by Uhl during the hearing. The trial court significantly states in its order only that "[t]he defense claims this has caused significant emotional and psychological hardship on [Uhl]."

Even if, viewing the record in the light most favorable to the trial court's ruling, we assume that the court found Uhl's speedy-trial testimony wholly credible, Uhl—as did the appellant in another recent case from this Court, which involved charges of trafficking a child and sexual assault of a child—"fails to distinguish between the consequences of delay and the more general drawbacks of criminal accusation." *See Laird*, 691 S.W.3d at 44. The bulk of the harms he professes to have suffered "resulted from the nature of the charges against him rather than the length of delay." *Id.*; *see Sample*, 653 S.W.3d at 295 (stating that "the evidence did not tie these harms to the delay rather than the nature of the charges against [defendant]" and that "even if a speedier trial had shortened the time the indecency charge was pending, it would not have avoided all of the negative effects to [defendant] of being charged with indecency with a child and sexual assault of an adult"). Other harm, such as Uhl's financial stress, was exacerbated by his own substantial role in causing delay in the case. *See Balderas*, 517 S.W.3d at 773 (remarking that "any prejudice to [defendant] was extenuated by his role in requesting the delay").

To summarize, Uhl was confined only one day during the almost six-year delay. On the record before us, he has not shown that he suffered anxiety or concern "beyond the level normally associated with a criminal charge or investigation." *See Cantu*, 253 S.W.3d at 286; *Barker*, 407 U.S. at 534 (describing prejudice as "minimal" despite defendant's being

30

"prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety"). He has not demonstrated that his defense was substantially impaired by the delay. Much of the prejudice alleged resulted from the nature of the charge, not the length of the delay. And, as discussed in our reason-for-delay analysis, he caused or acquiesced in a great deal of the delay. *See Barker*, 407 U.S. at 532; *Hopper*, 520 S.W.3d at 929; *Balderas*, 517 S.W.3d at 773; *Laird*, 691 S.W.3d at 44; *Davis*, 549 S.W.3d at 708; *Sample*, 653 S.W.3d at 295. For these reasons, viewing the record in the light most favorable to the trial court's ruling, we conclude that this factor weighs in favor of neither side. *See Cantu*, 253 S.W.3d at 285 (recognizing that "pretrial delay is often both inevitable and wholly justifiable" (quoting *Doggett*, 505 U.S. at 656)); *see also Barker*, 407 U.S. at 534 (finding little prejudice where, although defendant spent ten months in jail, he did not show that witnesses had become unavailable and identified lapses in memory "were in no way significant to the outcome").

## V. Balancing of Factors

The nearly six-year delay between Uhl's arrest and the hearing on his speedy-trial motion weighs heavily against the State. However, Uhl was responsible for almost half of the delay attributable to one party or the other and acquiesced in much of the delay for which the State was responsible. The second factor therefore weighs slightly against him. And although the period of delay was extreme, Uhl waited its entirety before asserting his speedy-trial right; asserted the right only once; and asked for dismissal instead of trial, even as a jury panel was present in courthouse. *See Cantu*, 253 S.W.3d at 281 ("[C]ourts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been

31

infringed."). The record supports the determination that he had no real interest in proceeding to trial. Moreover, his showing of prejudice was at best minimal and was extenuated by his role in causing the delay. *See Barker*, 407 U.S. at 534 ("More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial."). Thus, although we view the record in the light most favorable to the trial court's ruling and defer to its findings of fact where they are supported by that record, we conclude that the trial court erred by granting the motion to set aside the indictment and dismissing the cause with prejudice. *See Dragoo*, 96 S.W.3d at 316 (balancing "excessive" delay for which State failed to offer reason with defendant's failure to demonstrate prejudice and quiet acquiescence and concluding that weight of factors was "against finding a violation of [defendant]'s right to a speedy trial"). We sustain the State's issue on appeal.

## CONCLUSION

We reverse the trial court's order setting aside Uhl's indictment and remand this cause for further proceedings consistent with this opinion. *See Davis*, 549 S.W.3d at 710.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Theofanis and Ellis

Reversed and Remanded

Filed: June 11, 2025

Publish

32